

# SUPREME COURT OF MISSOURI
# en banc

| | |
|---|---|
| JASON D. DODSON, and JASON D. DODSON, JR., a Minor, and EVA RAINE DODSON-LOHSE, a Minor, and AUGUST WILLIAM DAVIS DODSON, a Minor, said Minors appearing by their duly appointed Next Friend, JASON D. DODSON, | ) ) ) ) ) ) ) ) |
| Respondent/Cross-Appellant, | ) ) |
| v. | ) No. SC95151 ) |
| ROBERT P. FERRARA, M.D. and MERCY CLINIC HEART and VASCULAR, LLC, | ) ) ) ) |
| Appellants/Cross-Respondents. | ) |

## APPEAL FROM THE CIRCUIT COURT OF ST. LOUIS COUNTY
The Honorable Thea A. Sherry, Judge

*Opinion issued April 19, 2016*

The family of Shannon Dodson ("Plaintiffs") brought a wrongful death action against defendant healthcare providers ("Defendants") after Ms. Dodson tragically died as a result of a dissection of her left main coronary artery during a cardiac catheterization. The jury returned a verdict in the amount of $1,831,155 for economic damages and

1

$9 million for noneconomic damages. The trial court reduced the noneconomic damages to $350,000 pursuant to section 538.210(1).[1] Both Plaintiffs and Defendants appeal.

Plaintiffs argue that the section 538.210(1) cap on noneconomic damages does not apply in wrongful death cases in light of *Watts v. Lester E. Cox Med. Ctr.*, 376 S.W.3d 633 (Mo. banc 2012), and, further, that imposing the cap only on wrongful death plaintiffs violates the equal protection, right to trial by jury or separation of powers provisions of the Missouri and United States Constitutions.

Plaintiffs also contend that the trial court erred in granting a directed verdict on the issue of aggravating circumstances damages at the close of Defendants' evidence, while Defendants argue that the trial court erred in not granting the motion for directed verdict on aggravating circumstances damages earlier in the case, specifically at the end of Plaintiffs' evidence.

Defendants' other issues on appeal are that the trial court failed to grant their motion for new trial, which concerned the questioning of two defense witnesses, and their motion for a directed verdict on the issue of economic damages, and that the court erroneously gave jury instruction No. 4 advising the jury to not consider insurance benefits.

This Court holds that the section 538.210 noneconomic damages cap does not violate the right to trial by jury in wrongful death cases. This issue was previously resolved in *Sanders v. Ahmed*, 364 S.W.3d 195 (Mo. banc 2012), which controls here. *Sanders* held that the wrongful death action was not recognized at common law in 1820

---

[1] Unless otherwise indicated, all statutory references are to RSMo Supp. 2013.

in Missouri but is, instead, a statutory creation subject to statutory caps and limitations. *Watts* does not impact the outcome of this case as *Watts* involved a claim for personal injury, which was a cause of action recognized at common law and was "not subject to legislative limits on damages" when the constitution was adopted in 1820. 376 S.W.3d at 638-39. As a result, *Watts* held that the statutory cap on damages violated the right to trial by jury as applied to medical malpractice actions alleging common law personal injury claims. *Id.* at 640.

Plaintiffs' claim that section 538.210 violates the separation of powers was also rejected by this Court in *Sanders*, 364 S.W.3d at 204-205.

Further, the section 538.210 noneconomic damages cap does not violate equal protection as the distinction in the treatment of common law personal injury plaintiffs and wrongful death plaintiffs is a product of this Court's interpretation of the right to trial by jury as driven by the constitutional provisions of this state. *See Watts*, 376 S.W.3d at 640, and *Sanders*, 364 S.W.3d at 202-204.

Plaintiffs also contend that the trial court erred in granting a directed verdict on the issue of aggravating circumstances damages at the close of Defendants' evidence. To make a submissible case for aggravating circumstances damages against healthcare providers, Plaintiffs were required to show that the healthcare providers demonstrated "willful, wanton or malicious misconduct" in their actions causing the damages as alleged in the petition. In light of the actions of the healthcare providers here, the evidence does not clearly and convincingly demonstrate that the healthcare providers acted with complete indifference to or conscious disregard for the safety of Ms. Dodson.

3

This Court finds no error in Defendants' other issues on appeal.

The judgment of the trial court is affirmed.

## I.    Factual Background

The facts of this case are devastating.  Shannon Dodson, a 34-year-old wife and mother, sought treatment for shortness of breath at Mercy Hospital St. Louis on February 8, 2011.  She was diagnosed with bronchitis.  After a stress echocardiogram indicated that there might be some abnormalities with Ms. Dodson's heart, a heart catheterization was recommended for further evaluation.

Dr. Robert Ferrara performed the heart catheterization on Ms. Dodson.  During the procedure, Ms. Dodson suffered a left main coronary artery dissection, which cut off blood flow to the left anterior descending artery.  Dr. Ferrara called for assistance, but no attempt was made to open the artery until approximately 30 minutes after the dissection occurred.  Both doctors were unsuccessful in attempting to place a stent in the artery, and Ms. Dodson was transferred to the operating room for emergency surgery more than 45 minutes after Dr. Ferrara first noticed the dissection.  The surgery was also unsuccessful, and Ms. Dodson died as a result of the dissection.

Ms. Dodson's spouse, Jason Dodson, and their three children sued Dr. Ferrara and his employer, Mercy Clinic Heart and Vascular, LLC, alleging that Dr. Ferrara's negligent care and treatment of Ms. Dodson caused or contributed to cause her death.  They also sought aggravating circumstances damages.

The case was tried to a jury.  At the close of all the evidence, the trial court gave a directed verdict in favor of Defendants on the claim for aggravating circumstances

4

damages. The jury returned a verdict in favor of Plaintiffs on their negligence claim and assessed damages in the amount of $305,737 for past economic damages, $1,525,418 for future economic damages, $1 million in past noneconomic damages, and $8 million in future noneconomic damages.

After judgment was entered, both parties filed numerous post-trial motions. The trial court granted Defendants' motion to reduce the $9 million noneconomic damages award to $350,000 pursuant to section 538.210.1. Both parties appealed. Because Plaintiffs raise constitutional challenges to a state statute that are real and substantial, this Court has exclusive appellate jurisdiction. [2] MO. CONST. art. V, section 3.

## II.    Standard of Review

Plaintiffs' first three points on appeal argue that the noneconomic damages cap in section 538.210 is unconstitutional. The interpretation of a statute is a question of law and is reviewed *de novo*. *In re Care & Treatment of Coffman*, 225 S.W.3d 439, 442 (Mo. banc 2007). Constitutional challenges to a statute are also issues of law that this Court reviews *de novo*. *State v. Young*, 362 S.W.3d 386, 390 (Mo. banc 2012).

In their final point on appeal, Plaintiffs claim that the trial court should not have granted a directed verdict on the issue of aggravating circumstances damages. Defendants also raise claims relating to the deferral or overruling of their motions for directed verdicts. The standard of review for a trial court's decision to grant or overrule a motion for a directed verdict is whether the plaintiff made a submissible case. *Investors*

---

[2] Additional relevant details regarding the facts of the case and the proceedings at trial will be discussed in the analysis section below.

*Title Co., Inc. v. Hammonds*, 217 S.W.3d 288, 296, 299 (Mo. banc 2007). A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. *Id.* at 299. When conducting its review, this Court views the evidence in the light most favorable to the plaintiff, and the plaintiff is given the benefit of all reasonable inferences. *Lasky v. Union Elec. Co.*, 936 S.W.2d 797, 801 (Mo. banc 1997); *see also Keveney v. Missouri Military Academy*, 304 S.W.3d 98, 104 (Mo. banc 2010). If the facts are such that reasonable minds could draw differing conclusions, the issue becomes a question for the jury, and a directed verdict is improper. *Lasky*, 936 S.W.2d at 801. If a party moves for judgment notwithstanding the verdict after a trial court overrules a motion for directed verdict, the jury's verdict will be upheld unless there is a complete absence of probative facts to support the jury's conclusion. *Keveney*, 304 S.W.3d at 104.

Defendants additionally allege error in the trial court's failure to grant their motion for new trial, which was based in relevant part on the questioning of two defense witnesses. This Court reviews the overruling of a motion for a new trial for abuse of discretion. *Kansas City v. Keene Corp.*, 855 S.W.2d 360, 372 (Mo. banc 1993). A new trial is available only when trial error or misconduct of the prevailing party incited prejudice in the jury. *Id.* Likewise, substantial deference is given to the trial court's determinations regarding the admissibility of evidence, which will not be disturbed absent an abuse of discretion. *Id.* The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack

6

of careful deliberate consideration. *Nelson v. Waxman*, 9 S.W.3d 601, 604 (Mo. banc 2000).

Finally, Defendants argue that the trial court erred in giving jury instruction No. 4 over Defendants' objections. Whether the jury was properly instructed is a question of law subject to *de novo* review. *Fleshner v. Prepose Vision Institute, P.C.*, 304 S.W.3d 81, 90 (Mo. banc 2010). This Court reviews the evidence in the light most favorable to submission of the instruction. *Edgerton v. Morrison*, 280 S.W.3d 62, 65-66 (Mo. banc 2009). To reverse a jury verdict, the party claiming instructional error must show that: (1) the instruction as submitted misled, misdirected, or confused the jury; and (2) prejudice resulted from the instruction. *Fleshner*, 304 S.W.3d at 90-91.

### III.    Analysis

**A. Plaintiffs' Constitutional Challenges to Section 538.210**

*1. Plaintiffs' Constitutional Claims were Properly Preserved for Review*

Before addressing the merits of Plaintiffs' constitutional arguments, it must first be determined whether the claims were preserved for appellate review. Defendants argue that Plaintiffs did not raise their constitutional challenges to section 538.210 at the earliest opportunity and, thereby, failed to preserve those claims for review by this Court. Section 538.210.1 imposes a cap on noneconomic damages in the amount of $350,000.

To properly raise a constitutional challenge, a party must: (1) raise the constitutional question at the first opportunity; (2) state with specificity the constitutional provision on which the challenge rests, either by explicit reference to the article and section or by quoting the provision itself; (3) set forth facts showing the violation; and

7

(4) preserve the constitutional question throughout the proceedings for appellate review. *Mayes v. Saint Luke's Hosp. of Kansas City*, 430 S.W.3d 260, 266 (Mo. banc 2014). This rule is intended to prevent surprise to the opposing party and accord the trial court an opportunity to fairly identify and rule on the issue. *Id.*

Defendants cited section 538.210 in their answer to Plaintiffs' petition, but they acknowledge that they did not plead it as an affirmative defense. Nonetheless, Defendants argue that Plaintiffs failed to raise their constitutional questions at the first opportunity because they did not raise the arguments in a reply to Defendants' answer.

Although Plaintiffs could have theoretically raised their constitutional challenges at the pleading stage of the case in anticipation of a jury verdict awarding Plaintiffs noneconomic damages in excess of the statutory cap, such action would serve no purpose. Section 538.210.1 has no application in a lawsuit unless an award exceeding the statutory cap is rendered. Until such time, the trial court would have no reason to rule on the constitutional validity of a statute whose application to the case in front of it is only hypothetical. The appropriate time for the court to hear and rule on arguments regarding the validity of section 538.210.1 is after the provisions of the statute are relevant to the lawsuit, i.e., after an award of noneconomic damages exceeding the statutory cap has been made. Prior to that time, arguments challenging the validity of section 538.210.1 or any ruling on that issue would be premature, and a rule necessitating that outcome would be nonsensical and inefficient.

In this case, Defendants moved for application of the noneconomic damages cap of section 538.210 after the jury returned its verdict. Plaintiffs timely filed their

8

suggestions in opposition to the motion and raised their constitutional challenges to the cap, which are the subject of their appeal here. The trial court heard exhaustive arguments by both parties and issued its ruling granting Defendants' motion. Defendants suffered no surprise that impeded their ability to effectively respond to Plaintiffs' constitutional claims. Under the facts here, Plaintiffs timely raised their constitutional questions and thereby properly preserved them for appellate review.

2. *The Section 538.210 Noneconomic Damages Cap Does Not Violate the Right to a Jury Trial When Applied to Wrongful Death Cases*

Plaintiffs contend that the trial court erred in applying the section 538.210 noneconomic damages cap because it violates the right to trial by jury.

Article I, section 22(a) of the Missouri Constitution provides "[t]hat the right of a trial by jury as heretofore enjoyed shall remain inviolate." The Court has interpreted this provision to mean that the right to a jury trial is "beyond the reach of hostile legislation and [is] preserved" as it existed at common law before the state constitution's first adoption in 1820. *State ex rel. St. Louis, Keokuk & Nw. Ry. Co. v. Withrow*, 36 S.W. 43, 48 (Mo. banc 1896). The phrase "heretofore enjoyed" means that "the constitution protects the right as it existed when the constitution was adopted and does not provide a jury trial for proceedings subsequently created." *Hammons v. Ehney*, 924 S.W.2d 843, 848 (Mo. banc 1996).

*Sanders v. Ahmed* squarely answers the question raised by Plaintiffs here. 364 S.W.3d 195 (Mo. banc 2012). In *Sanders*, the plaintiff's wife died as a result of the seizure medication prescribed by her doctor. *Id.* at 201. The jury found for the plaintiff,

9

awarding him $920,745.88 in economic damages and $9.2 million in noneconomic

damages. *Id.* at 202. On the defendant's motion, the trial court reduced the noneconomic

damages in accordance with the damages cap in section 538.210, RSMo 2000.[3] *Id.* On

appeal, the plaintiff argued that the mandatory cap on noneconomic damages violated the

right to a trial by jury under article I, section 22(a). *Id.* The *Sanders* Court recognized

that wrongful death is a purely statutory cause of action that did not exist at common law.

*Id.* at 203. As a result, "the legislature has the authority to choose what remedies will be

permitted" because it created the cause of action. *Id.* The Court held that the

noneconomic damages cap of section 538.210 did not violate article I, section 22(a) of

the Missouri Constitution because the statute "merely placed limits on the amount of

noneconomic damages recoverable under a statutorily created cause of action." *Id.* at

204.

The facts of this case are virtually indistinguishable from those in *Sanders*. In

both cases, plaintiffs filed wrongful death medical malpractice actions, both sets of

plaintiffs received jury awards in excess of the statutorily prescribed cap, and the trial

courts accordingly reduced the noneconomic damages awarded in both cases to the

maximum amount permitted by the statute. *Sanders* is directly on point, and its holding

would seemingly control the outcome of this case.

---

[3] Section 538.210 was amended in 2005. The action in *Sanders* accrued prior to the date
of that amendment, so the earlier version of the statute applied in that case. Because
Plaintiffs' injury here arose after 2005, the amended statute governs their cause of action.
As will be discussed in more detail below, the legislature amended section 538.210 again
in 2015.

Nonetheless, Plaintiffs argue that *Sanders* is not dispositive. First, Plaintiffs contend that *Sanders* upheld a pre-2005 version of section 538.210 that is fundamentally different from the 2005 statute applicable to this case. Second, they argue that *Watts v. Lester E. Cox Medical Centers*, 376 S.W.3d 633 (Mo. banc 2012), not *Sanders*, actually controls the outcome of this case. Finally, they claim that section 538.210.1 is not severable and, consequently, that there was no valid statute for the trial court to apply in this case due to the holding in *Watts*, which held that the damages cap is unconstitutional when applied to common law personal injury claims. *See id.*

a. 2005 Amendments to Section 538.210 Do Not Affect the Analysis in *Sanders*

Addressing each of these arguments in turn, Plaintiffs first claim that *Sanders* interpreted section 538.210 prior to its amendment in 2005 and that the 2005 statute is fundamentally different from the previous version upheld in *Sanders*. Prior to 2005, section 538.210 capped noneconomic damages awards at $350,000 "per occurrence" and "per defendant." Section 538.210.1, RSMo 2000. The pre-2005 version of section 538.210 also permitted courts to adjust the cap for inflation. *Id.* The 2005 amendment limited the potential recovery to $350,000 "irrespective of the number of defendants" and removed the adjustment for inflation. Section 538.210.1, RSMo Supp. 2013.

*Sanders* affirms the ability of the legislature to define the recovery available for a statutorily created wrongful death cause of action. 364 S.W.3d at 204. It did not discuss the specific limits on the recovery available under the previous version of section 538.210, nor did it give any indication that its analysis would be altered if the legislature decided to place different limitations on plaintiffs under the statute. This Court's analysis

11

in *Sanders* is not affected by any changes the legislature enacted regarding the recovery available under section 538.210. Consequently, *Sanders* controls in this case despite the 2005 amendment to the statute.

b. *Sanders*, Not *Watts*, Applies to Plaintiffs' Claims

Next Plaintiffs argue that *Watts*, not *Sanders*, governs the outcome of this case. They are incorrect. *Watts* involved a common law claim for personal injury (non-wrongful death) medical malpractice filed by a mother on behalf of her son. 376 S.W.3d at 636. She alleged that her son was born with catastrophic brain injuries due to the negligence of the doctors employed by the defendant hospital. *Id.* A jury awarded the plaintiff $1.45 million in noneconomic damages. The trial court entered judgment reducing that award to $350,000 as required by section 538.210.[4] *Id.* The plaintiff challenged the statute as a violation of the right to a trial by jury guaranteed by article I, section 22(a) of the Missouri Constitution. *Id.* The Court found that the plaintiff's personal injury claim, including her claim for noneconomic damages, was a claim based in the common law and, therefore, was "not subject to legislative limits on damages" when the constitution was adopted in 1820. *Id.* at 638-39. The Court held that the statutory cap on damages in section 538.210 violated the right to a jury trial as applied to medical malpractice actions alleging common law personal injury claims. *Id.* at 640-41.

_____

[4] Due to the date of the alleged negligence in *Watts*, the 2005 amendment to section 538.210 was applicable to *Watts's* claims.

12

*Watts* did not overrule *Sanders*.[5]  Instead, *Watts* differentiated common law causes of action as not being subject to legislative limits on the right to trial by jury.  By its own terms, *Watts* applies to "cause[s] of action to which the right to jury trial attaches at common law."  *Id.* at 640.  As the Court noted in *Sanders*, wrongful death actions were not recognized at common law in 1820 in Missouri but, instead, are creatures of statute.  Because Plaintiffs' action is for wrongful death, *Sanders* provides the correct analysis of their constitutional challenge.

Plaintiffs also contend that the right to a jury trial attaches to a wrongful death claim even if such claims were not cognizable at common law prior to 1820 and, therefore, *Watts* still prohibits legislative limitations on jury awards in wrongful death cases.  They look to *State ex rel. Diehl v. O'Malley* for support.  95 S.W.3d 82 (Mo. banc 2003).  In *Diehl*, a plaintiff asserting claims under the Missouri Human Rights Act (MHRA) was denied the opportunity to try her case to a jury because her claims were statutorily created and did not exist at common law.  *Id.* at 84-85.  This Court determined that the right to a jury trial attaches if the claim being asserted is "analogous to" actions existing at common law prior to 1820 that carried the right to a jury trial.  *Id.* at 86.  Actions that carried the right to a jury trial at common law were civil actions for damages.  *Id.* at 92.  Finding that the plaintiff's action under the MHRA was "a civil action for damages" "analogous to" the kinds of actions triable by juries prior to 1820, the Court held that the right to a jury trial attached and, consequently, the plaintiff had the

---

[5] *Watts* does not mention *Sanders*.  This Court presumes that, absent a contrary showing, an opinion of the Court has not been overruled *sub silentio*.  *See State v. Honeycutt*, 421 S.W.3d  410, 422 (Mo. banc 2013).

13

right to try her case to a jury.  *Id.* at 87-88, 92.  The analysis in *Diehl*, which focuses

exclusively on whether the claimant brings a civil action for damages as opposed to an

equitable claim or an administrative action, is of no relevance in determining whether the

constitutional right to a jury trial bars enforcement of legislatively created limitations on

the amount of damages recoverable under a statutory wrongful death cause of action.

Instead, *Sanders* and *Watts* set forth a different analysis for determining whether

the constitutional right to a jury trial is violated by legislative caps on recoveries.  In

*Sanders*, the Court held:

> *The legislature has the power to define the remedy available if it creates*
> *the cause of action.*  The Court's recent opinion in *Overbey* affirms:
>
> > [T]he legislature has the authority to choose what remedies will be
> > permitted under a statutorily created cause of action ….
> >
> > > The legislature in so doing, at least in regard to a statutorily
> > > created cause of action … limited "the substance of the claims
> > > themselves," as it has a right to do in setting out the parameters
> > > of a statutory cause of action.

*Sanders*, 364 S.W.3d at 203 (quoting *Estate of Overbey v. Chad Franklin Nat'l*

*Auto Sales N.,* LLC, 361 S.W.3d 364, 375 (Mo. banc 2012)) (emphasis added).  As this

Court stated in *Sanders*:

> To hold otherwise would be to tell the legislature it could not legislate; it
> could neither create nor negate causes of action, and in doing so could not
> prescribe the measure of damages for the same.  This Court never has so
> held and declines to do so now.  The General Assembly has the right to
> create causes of action and to prescribe their remedies.  The General
> Assembly may negate causes of action or their remedies that did not exist
> prior to 1820.  The judiciary has the duty to prescribe the trial process and
> to protect those rights to jury trial as existed prior to 1820.

 364 S.W.3d at 205.

14

In *Watts*, on the other hand, the Court held that such caps "infringe[ ] on the right to trial by jury when applied to a cause of action *to which the right to jury trial attaches at common law*." 376 S.W.3d at 640 (emphasis added).

Plaintiffs alternatively contend that *Watts* should control because Missouri did, in fact, recognize a wrongful death claim at common law prior to 1820. This Court has consistently rejected the existence of any common law cause of action for wrongful death.[6] Although Plaintiffs acknowledge this precedent, they insist that *James v. Christy* demonstrates that wrongful death claims did exist at common law in this state prior to the passage of the first wrongful death statute in 1855. 18 Mo. 162 (1853). Plaintiffs' belief is misplaced. The action in *James* was initially brought by a father to recover for the lost services of his minor son due to the son's death, which the father alleged was caused by the defendants. *Id.* at 163. The father died before the case went to trial, so the administrator of his estate pursued the claim in the father's place. *Id.* at 163-64. The main issue in *James* was "whether the action survived to the administrator of the deceased," *not* whether Missouri recognized a wrongful death cause of action in tort. *Id.*

---

[6] *See, e.g., McNamara v. Slavens*, 76 Mo. 329, 330 (Mo. 1882); *Barker v. Hannibal & St. Joseph R. Co.*, 14 S.W. 280, 281 (Mo. 1886); *Hennessy v. Bavarian Brewing Co.*, 46 S.W. 966, 967 (Mo. 1989); *Allen v. Dunham*, 175 S.W. 135, 137 (Mo. App. 1915); *Clark v. Kansas City, St. L. & C.R. Co.*, 118 S.W. 40, 45 (Mo. 1909); *Jordan v. St. Joseph Ry., Light, Heat & Power Co.*, 73 S.W.2d 205, 212 (Mo. 1934); *Cummins v. Kansas City Public Service Co.*, 66 S.W.2d 920, 922 (Mo. 1933); *Demattei v. Missouri-Kansas-Texas R. Co.*, 139 S.W.2d 504, 505 (Mo. 1940); *Baysinger v. Hanser*, 199 S.W.2d 644, 647 (Mo. 1947); *Knorp v. Thompson*, 175 S.W.2d 889, 895 (Mo. 1943); *Plaza Exp. Co. v. Galloway*, 280 S.W.2d 17, 21-22 (Mo. banc 1955); *Nelms v. Bright*, 299 S.W.2d 483, 487 (Mo. banc 1957); *Frazee v. Partney*, 314 S.W.2d 915, 918 (Mo. 1958); *Glick v. Ballentine Produce, Inc.*, 396 S.W.2d 609, 613-14 (Mo. 1965), *overruled on other grounds by Bennett v. Owens-Corning Fiberglas Corp.*, 896 S.W.2d 464 (Mo. banc 1995); *Sanders v. Ahmed*, 364 S.W.3d 195, 203 (Mo. banc 2012).

15

at 164. This Court concluded that the cause of action could be maintained by the administrator because it survived the father's death under the Missouri statute governing the administration of estates. *Id.* Importantly, this Court held that the action survived because the father had "*property* in the services of his son during his minority." *Id.* (Emphasis added).

Although the plaintiff in *James* was allowed to recover for the lost services of his son under common law, that action is not the same as an action for the wrongful death of his son. Missouri courts have repeatedly distinguished the "loss of services" action from a true wrongful death claim and have consistently held that a loss of services action akin to the one in *James* is not related to wrongful death claims. *James* is "an action for a wrong done to the property rights of the father"; it is "not [considered] an action for injuries to the person of the [father]." *Stanley v. Bircher's Ex'r*, 78 Mo. 245, 248 (Mo. 1883). Actions like *James* "rest upon entirely different principles, and involve rights arising out of the relation of parent and child, and [are] not questions of tort." *Hennessy v. Bavarian Brewing Co.*, 46 S.W. 966, 967 (Mo. 1898).

As this Court stated in the decades immediately following *James*, "it is clear that, if the father in [*James*] had brought an action for the death of the infant son" rather than an action for loss of services, "he could not have recovered" because the case was decided two years prior to the enactment of the first wrongful death statute and "the death of a human being gave rise to no civil action [at common law] in behalf of any person under any circumstances." *Bates v. Sylvester*, 104 S.W. 73 (Mo. 1907). *James* is not

16

evidence that Missouri recognized a wrongful death claim at common law because *James* is not a wrongful death case.

Further, modern statutory wrongful death claims are not "analogous to" loss of services actions like the one in *James*, as Judge Teitelman's dissent suggests. On the contrary, *James* rests "on the theory that the relationship between the plaintiff father and his minor son" is akin to "the contractual relationship of master and servant." *Mennemeyer v. Hart*, 221 S.W.2d 960, 961 (Mo. 1949). The father's recovery in *James* flowed from the impairment of his property rights under that quasi-contractual relationship,[7] not from a tort claim based on the personal injury sustained by the son resulting in his death. *See Hennessy*, 46 S.W. at 967 (Mo. 1898) (action for loss of services arises "ex contractu or in assumpsit," not "in tort"); *see also Stanley v. Vogel*, 9 Mo. App. 98, 100 (Mo. App. 1880) (the recovery in *James* "rested upon a breach of contract obligation, which breach involved injury to the property of the father").

The loss of services action is not dependent on the death of the minor child, nor does it hinge on proof of negligence. *See Berry v. Majestic Milling Co.*, 210 S.W. 434, 434-35 (Mo. 1919). The loss of services action in *James*, which sounds in contract, is not analogous to a modern wrongful death claim, which sounds in tort. They may both be civil actions for monetary damages, but they arise from completely different principles of law. [8]

---

[7] Of course, modern society no longer views children as "servants" of their fathers. *See Mennemeyer*, 221 S.W.2d at 962.

[8] Judge Teitelman's dissent also relies on language in *James* indicating that, had the father lived to bring suit himself, he could potentially have recovered for "the loss of

In conclusion, this Court holds once more that Missouri does not recognize a common law wrongful death claim; additionally, the Court finds that the statutory wrongful death claim is not "analogous to" a common law loss of services action. As such, *Sanders*, not *Watts*, still governs the analysis of Plaintiffs' challenge to section 538.210.[9] The General Assembly has the right to create causes of action and to prescribe their remedies, and that is exactly what it has done here. The Court realizes that the jury's award for Plaintiffs' noneconomic damages for the loss of their young wife and mother will unfortunately be drastically lowered by the section 538.210 damages cap. Nonetheless, section 538.210 does not violate the right to a trial by jury as applied to wrongful death medical malpractice claims and so must be applied here.

### c. Section 538.210 Is Severable

Plaintiffs finally argue that section 538.210.1 is not severable, so the entire noneconomic damages cap is invalid and cannot be applied to their claim. As noted above, *Watts* only invalidated section 538.210 to the extent that its limitations infringed on the right to a jury trial for common law personal injury actions. *Watts*, 376 S.W.3d at 636. If the invalid portion of the statute cannot be severed from the other provisions as

society or comforts afforded by a child to his parent." *James*, 18 Mo. at 164. Reliance on this statement is misplaced. The question before the Court in *James* was whether the father's loss of services action survived to the administrator, not what damages are recoverable in such an action. *Id.* at 162-63. The Court's discussion of the damages potentially recoverable had the father brought suit himself is not supported by any authority and is mere dicta, as it is not essential to the holding of the case.

[9] Judge Teitelman's dissent would have this Court overrule *Sanders*, a case decided only four years ago, to reach the dissent's intended result. The principles of legislative deference as well as *stare decisis* should be respected, and previous decisions of this Court should not be overruled lightly. *Boland v. Saint Luke's Health System, Inc.*, 471 S.W.3d 703, 711 (Mo. banc 2015).

Plaintiffs here contend, then the entirety of the provision would be invalid and unenforceable.

Upon a finding of invalidity as to one provision of a statute, courts are to presume that the legislature intended to give effect to the other parts of the statute that are not invalidated. *Akin v. Dir. of Revenue*, 934 S.W.2d 295, 300-301 (Mo. banc 1996). The presumption in favor of severability is codified at section 1.140, RSMo 2000:

> The provisions of every statute are severable. If any provision of a statute is found by a court of competent jurisdiction to be unconstitutional, the remaining provisions of the statute are valid unless the court finds the valid provisions of the statute are so essentially and inseparably connected with, and so dependent upon, the void provision that it cannot be presumed the legislature would have enacted the valid provisions without the void one; or unless the court finds that the valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

Accordingly, this Court must uphold valid portions of a statute despite the invalidity of other portions when: (1) after separating the invalid portions, the remaining portions are in all respects complete and susceptible of constitutional enforcement; and (2) the remaining statute is one that the legislature would have enacted if it had known that the rescinded portion was invalid. *Simpson v. Kilcher*, 749 S.W.2d 386, 393 (Mo. banc 1988).

The relevant text of section 538.210.1 provides that, "[i]n any action against a health care provider for damages for personal injury or death arising out of the rendering of or the failure to render health care services, no plaintiff shall recover more than three hundred fifty thousand dollars for noneconomic damages irrespective of the number of defendants." *Watts* declared this provision invalid as applied to common law personal

19

injury claims. *Watts*, 376 S.W.3d at 636. By crossing out the words "personal injury," the invalid portion of the statute is eliminated. The remaining provision still coherently and validly limits the recovery of noneconomic damages in any action against a health care provider for "death" arising out of medical negligence. *See Sanders*, 364 S.W.3d at 204. The legislature has shown a clear intent to limit the recovery of noneconomic damages in both personal injury and wrongful death cases against health care providers. There is no reason to conclude that that the legislature would choose not to limit recovery in wrongful death cases, when it validly may do so, simply because it could not similarly limit recovery in personal injury actions.

   3. *The Section 538.210 Noneconomic Damages Cap Does Not Violate Equal Protection*

In their next point on appeal, Plaintiffs argue that the section 538.210 noneconomic damages cap denies wrongful death medical malpractice plaintiffs the equal protection of the law as guaranteed by both the federal and state constitutions. *See* U.S. CONST. amend. XIV, sec. 1; MO. CONST. art. I, sec. 2. They claim that, as a result of the holdings in *Sanders* and *Watts*, section 538.210 arbitrarily limits the recovery when medical malpractice resulted in the death of the patient, but allows unlimited recovery to persons who were only injured by medical malpractice. [10]

---

[10] It is noted that during the 2015 session, the legislature stated in a truly agreed to and finally passed bill that it was abrogating any common law cause of action arising out of personal injury for medical malpractice claims and creating a statutory cause of action in its place. Section 538.210, RSMo Supp. 2015. Because the legislature recognized the inadequacy of a $350,000 cap in cases involving catastrophic injury or death, the statute now caps noneconomic damages for personal injury at $400,000 per plaintiff and for wrongful death or "catastrophic personal injury" at $700,000 per plaintiff. *Id.* The 2015

20

Missouri Constitution article I, section 2 and the 14th Amendment to the United States Constitution guarantee equal rights and opportunities under the law. *Comm. for Educ. Equality v. State*, 294 S.W.3d 477, 489 (Mo. banc 2009). These guarantees do not mean that the state may never make distinctions between individuals or groups of people. As a practical necessity, most legislation makes distinctions among people for a variety of purposes. *Overbey*, 361 S.W.3d at 378 (Mo. banc 2012). The state may treat different groups differently, but to treat similarly situated persons differently it must have adequate justification. *Comm. for Educ. Equality*, 294 S.W.3d at 489.

If a law impacts a "fundamental right" or distinguishes between groups based on a "suspect classification," it is subject to strict scrutiny, meaning that the state must justify the law by showing that it is necessary to accomplish a compelling state interest. *Doe v. Phillips*, 194 S.W.3d 833, 845 (Mo. banc 2006). Plaintiffs do not claim that wrongful death medical malpractice plaintiffs are a suspect class. They do allege, however, that the noneconomic damages cap of section 538.210 impacts a fundamental right because it impermissibly restricts the right to a jury trial. But this Court has already rejected that argument. *See Sanders*, 364 S.W.3d at 204. Plaintiffs can point to no fundamental right that is infringed by section 538.210. Alternatively, they argue that their claims should be analyzed under rational basis review, under which a law is adequately justified so long as it bears a rational relation to some legitimate state interest. *Doe*, 194 S.W.3d at 845.

---

legislation also adjusted the limitations on awards for noneconomic damages upward by 1.7 percent annually to account for inflation. *Id.* This amendment is not before the Court in this case.

21

Plaintiffs maintain that even under rational basis review, the noneconomic damages cap of section 538.210 does not pass constitutional muster because it now arbitrarily differentiates between wrongful death medical malpractice plaintiffs and the similarly situated group of personal injury medical malpractice plaintiffs due to the holdings in *Sanders* and *Watts*. They point out the illogic in limiting the recovery available when medical malpractice results in death while permitting unlimited recovery when the patient survives.

This Court rejected an equal protection challenge to the damages cap of section 538.210 in *Adams By and Through Adams v. Children's Mercy Hosp..* 832 S.W.2d 898 (Mo. banc 1992).[11] The plaintiffs in *Adams* claimed that section 538.210 unconstitutionally denied medical malpractice plaintiffs the equal protection of the law by capping noneconomic damages in medical malpractice cases but not in other personal injury cases. *Id.* at 903-04. This Court acknowledged that section 538.210 treats parties in a medical malpractice lawsuit "much differently" than parties in other types of tort lawsuits by placing a cap on noneconomic damages in medical malpractice actions. *Id.* at 904. After determining that the statute did not involve a suspect class or infringe on any fundamental right, rational basis review was applied, noting that "[t]he fact that we think

---

[11] *Adams* involved a number of constitutional challenges to the noneconomic damages cap of section 538.210 as applied to a personal injury medical malpractice action, including claims that it violated equal protection and the right to a jury trial. *Adams*, 832 S.W.2d at 900. *Adams* held that the statute did not violate the right to a trial by jury even though the plaintiff asserted a common law personal injury claim. *Id.* at 907. *Watts* overruled *Adams* only "to the extent that it holds that the section 538.210 caps on noneconomic damages do not violate the right to trial by jury" when applied to personal injury claims that existed at common law. *Watts*, 376 S.W.3d at 646.

the legislature's choices socially undesirable, unwise, or even unfair is of little

consequence to our decision … if the legislature's classification advances the

legislature's legitimate policy." *Id.* at 903.

*Adams* discussed at length the history of section 538.210 and its intended purpose

of alleviating the perceived medical malpractice insurance crisis in the state:

> The exact purpose of this classification is somewhat uncertain. Amici
> supporting the legislation tell us that the provisions of Chapter 538 were
> enacted in 1986 in an effort to address a perceived malpractice insurance
> crisis in the health care industry which in turn threatened the availability
> and affordability of health care services. According to Amicus Briefs in
> support of the health care respondents, the legislature had before it
> information that the number of malpractice claims in Missouri increased
> 249 percent between 1981 and 1986; that aggregate and individual damage
> awards had accelerated to the extent that the state risked losing insurers;
> and that many physicians were believed to be considering leaving high risk
> areas of practice, potentially leaving many Missourians, particularly those
> in rural areas, without adequate medical protection. Thus, we are told that
> the primary goal of the General Assembly in passing Chapter 538 was to
> confront a medical malpractice insurance crisis that threatened adversely to
> affect primary health care in Missouri. Accordingly, the statute represents
> an effort by the legislature to reduce rising medical malpractice premiums
> and in turn prevent physicians and others from discontinuing "high risk"
> practices and procedures.
>
> Both sides offer an array of evidence that both supports and refutes the
> existence of a "crisis" in medical malpractice premiums—enough evidence,
> in fact, that at the very least, it is a debatable proposition that such a crisis
> does in fact exist.

*Id.* at 904. Despite the conflicting evidence as to the existence and severity of any

medical malpractice insurance crisis, this Court found that the damages cap in section

538.210 was rationally related to a legitimate state interest:

> Under equal protection rational review, this doubt must be resolved in favor
> of the General Assembly. While some clearly disagree with its
> conclusions, it is the province of the legislature to determine socially and

23

> economically desirable policy and to determine whether a medical malpractice crisis exists. Here, the preservation of public health and the maintenance of generally affordable health care costs are reasonably conceived legislative objectives that can be achieved, if only inefficiently, by the statutory provision under attack here.

*Id.*

As recognized in *Adams*, the legislature created the damages cap in an effort to reduce perceived rising medical malpractice premiums and prevent physicians from leaving "high risk" medical fields. It is not for this Court to evaluate the wisdom or desirability of the policy decisions made by the legislature when it passed section 538.210.

Section 538.210's treatment of all medical malpractice plaintiffs remained the same until this Court decided *Watts*. This Court in *Watts* distinguished medical malpractice plaintiffs based on whether they brought a statutory wrongful death claim or a common law personal injury claim. The classification of medical malpractice plaintiffs that Plaintiffs complain of was not created by the legislature but is instead the result of this Court's interpretation of article I, section 22(a) of the Missouri Constitution in *Watts*. This Court's classification was driven by the constitutional provisions of this state. Plaintiffs cite no cases holding that equal protection analysis is appropriate in judicial determinations. [12] Absent a United States Supreme Court decision saying otherwise, this Court will presume its decisions to be in compliance with the constitution.

---

[12] Equal protection analysis, however, has been employed when a court is functioning in its administrative capacity. For example, *see Mayer v. City of Chicago*, 404 U.S. 189, 195-96 (1971) (holding that an Illinois Supreme Court Rule violated equal protection by unreasonably denying impoverished defendants convicted of a misdemeanor the

24

The noneconomic damages cap of section 538.210 does not deny Plaintiffs the equal protection of the law.

4. *The Section 538.210 Noneconomic Damages Cap Does Not Violate Separation of Powers*

Plaintiffs finally argue that the section 538.210 noneconomic damages cap is unconstitutional because it violates separation of powers as required by article II, section 1 of the Missouri Constitution. Plaintiffs argue that the cap interferes with the judicial prerogative of remittitur, but they cite no Missouri authority in support of this argument other than the dissenting opinion in *Sanders*.

"It is difficult to point out the precise boundary which separates legislative from judicial duties." *Sanders*, 364 S.W.3d at 204-205. This Court recognizes the wide discretion vested with the legislature in determining the means through which laws are executed. *Id.* at 205.

This Court in *Sanders* rejected an argument that section 538.210 violates the separation of powers. *Id.* The legislature created the wrongful death cause of action, which was well within its power as the lawmaking authority of the state. *See id.* It follows that the legislature has the power to prescribe the remedy for the cause of action it created without infringing on the role and authority of the judiciary. "The limit on damages within section 538.210 interferes neither with the jury's ability to render a verdict nor with the judge's task of entering judgment; rather, it informs those duties."

opportunity to perfect an appeal), and *Konigsberg v. State Bar of California*, 366 U.S. 36, 45 (1961) ("The fact that this rule finds its source in the supervisory powers of the California Supreme Court over admissions to the bar, rather than in legislation, is not constitutionally significant.").

25

*Id.* The noneconomic damages cap of section 538.210 does not impinge on the judicial power of remitter, and it does not violate separation of powers.

## B. Parties' Remaining Points On Appeal

### 1. The Trial Court Did Not Err in Granting Defendants' Motion for Directed Verdict on Plaintiffs' Claim for Aggravating Circumstances Damages at the Close of all the Evidence

Both parties allege error in the trial court's actions concerning Plaintiffs' claim for aggravating circumstances damages. Plaintiffs argue that the trial court should not have directed a verdict for Defendants on this claim. Defendants argue that the trial court was correct to grant their motion for "Directed Verdict at the Close of All Evidence" as to the aggravating circumstances damages claim. They claim, however, that the trial court committed reversible error by waiting until the close of all the evidence to do so when Defendants first moved for a directed verdict at the close of Plaintiffs' evidence. Defendants argue that by failing to grant their motion when it was first made, the trial court forced them to defend against the unmeritorious claim for aggravating circumstances damages by putting on evidence of other dissections that Dr. Ferrara either observed or participated in, and that this evidence was irrelevant to the negligence claim against them and highly prejudicial to the defense. As both parties' arguments concern the same issue, they will be addressed together.

To make a submissible case for aggravating circumstances damages against health care providers in a medical negligence action, a plaintiff must show that the health care provider demonstrated "willful, wanton or malicious misconduct with respect to his actions which are found to have injured or caused or contributed to cause the damages

26

claimed in the petition." Section 538.210.5. Section 538.205(10) defines "punitive damages" as those intended to punish or deter willful, wanton or malicious misconduct, which includes exemplary damages and damages for aggravating circumstances. To support a claim for aggravating circumstances damages or for punitive damages, the plaintiff must present clear and convincing evidence at trial to support the claim. *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 160 (Mo. banc 2000).

Defendants correctly point out that damages for aggravating circumstances are not generally recoverable in negligence actions because "negligence, a mere omission of the duty to exercise care, is the antithesis of willful or intentional conduct." *Hoover's Dairy, Inc. v. Mid-American Dairymen, Inc./Special Products, Inc.*, 700 S.W.2d 426, 435-36 (Mo. banc 1985). Nonetheless, both Missouri Approved Instruction (MAI) 10.02 and MAI 10.07 provide that punitive damages may be awarded for a negligent act or omission if the jury finds that the conduct of the defendant "showed complete indifference to or conscious disregard for the safety of others." MAI 6.02 states that the same showing is necessary for an award of aggravating circumstances damages in a wrongful death case when the theory of liability is negligence.[13]

---

[13] Defendants argue that, because chapter 538 does not contain its own definition of "willful, wanton or malicious misconduct," this Court should turn to a dictionary to determine the plain meaning of these words. They contrast the dictionary definitions of "willful," "wanton," and "malicious" with the definition of the word "reckless," apparently in an attempt to argue that recklessness cannot be the foundation of an award for aggravating circumstances damages in actions filed under chapter 538. Defendants provide no reason why a claim for aggravating circumstances damages under chapter 538 should be analyzed differently from other wrongful death claims, nor do they dispute the standard for punitive damages or aggravating circumstances damages as set forth in MAI 10.02, MAI 10.07, and MAI 6.02.

27

Plaintiffs failed to prove that Dr. Ferrara acted with complete indifference to or a conscious disregard for the safety of others. Plaintiffs introduced portions of Dr. Ferrara's videotaped deposition at trial. Dr. Ferrara indicated that he noticed the dissection in the left main coronary artery at approximately 3:53 p.m. He said he did not take immediate action to prepare to stent Ms. Dodson or to send her to the operating room for a bypass surgery because she was alert and vitally stable for a period of approximately 12 minutes after the dissection occurred. During that time, Dr. Ferrara: (1) called another physician for assistance in determining whether to attempt to stent Ms. Dodson; (2) called the operating room to inform the surgeons that they may need to perform a surgery on Ms. Dodson; and (3) performed a number of procedures to evaluate the extent of the dissection and the condition of the right side of Ms. Dodson's heart. Before assistance arrived, Ms. Dodson reported severe chest pain and subsequently went in to cardiac arrest. Cardiopulmonary resuscitation (CPR) was administered to her, and she came back to full alertness. At that point, Dr. Ferrara decided to insert an intra-aortic balloon pump, a device which is used to support the heart. Once assistance arrived about 25 minutes after Dr. Ferrara first noticed the dissection, an attempt to stent the artery was unfortunately unsuccessful.

By the time Ms. Dodson got to the operating room, almost 48 minutes after Dr. Ferrara first noticed the dissection, she was once again in cardiac arrest and in need of CPR and chest compressions. The surgeons who performed the bypass surgery stated in their videotaped depositions that they knew she had a poor chance of survival given her condition going into the surgery.

All of Plaintiffs' expert witnesses, as well as Dr. Ferrara and the physician who assisted him, agreed that a dissection was an emergent condition that required immediate attention. Dr. Ferrara testified about his understanding that, in the event of a total occlusion of the left main coronary artery, as apparently occurred here, one has approximately 30 minutes to reestablish blood flow before the cells of the heart muscle begin to die.

Plaintiffs failed to make a submissible case demonstrating that Dr. Ferrara acted with complete indifference to or conscious disregard for the safety of Ms. Dodson. The Plaintiffs' own evidence indicates that Dr. Ferrara took affirmative action to address the dissection by placing a call to another physician for assistance and to the operating room and by inserting an intra-aortic balloon pump to support Ms. Dodson's heart. The timeliness and appropriateness of Dr. Ferrara's decisions may be questionable, but the evidence indicates that he did take steps to save Ms. Dodson's life. His conduct may have been negligent, but it did not show a conscious disregard for Ms. Dodson's safety.

This is not to say that the trial court erred by failing to grant Defendants' motion for a directed verdict immediately after the close of Plaintiffs' case. A directed verdict is a drastic measure that is not appropriate when the facts are such that reasonable minds could draw differing conclusions. *Lasky v. Union Elec. Co.*, 936 S.W.2d 797, 801 (Mo. banc 1997). A defendant's case may also be relevant to determining whether there is sufficient evidence to support an award for aggravating circumstances damages. A jury may conclude that an "aggressive defense at trial on either the issue of breach of duty or causation may supply" the element of complete indifference or conscious disregard

29

necessary to an award of aggravating circumstances damages. *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 248 (Mo. banc 2001).

The record here reflects that, at the close of Plaintiffs' case, the trial court was unsure whether Plaintiffs had made a submissible case for aggravating circumstances damages, which indicates that reasonable minds could differ as to whether Plaintiffs had established the requisite elements at that point. The trial court did not err in delaying a decision on Defendants' motion for "Directed Verdict at the Close of All Evidence" until after it heard Defendants' case.

2. *The Trial Court Did Not Abuse Its Discretion By Overruling Defendants' Objection to the Questioning of Defendants' Expert Witness*

Defendants next argue that the trial court committed reversible error by overruling their objection to Plaintiffs' questioning of one of the expert witnesses for the defense. They claim that the questioning introduced irrelevant and prejudicial information into the trial and impermissibly impugned the credibility of all doctors from the St. Louis area, including other expert witnesses called by the defense. In response to a question asking whether the witness had reviewed potential medical negligence cases for plaintiffs, he stated:

> I don't think I've been requested to answer—to review any for plaintiffs, at least that I recall recently. I've done it in the past, and I do—and have been consulted by attorneys about some that I've said that I think they do or do not have a case and referred them to—if they're in the St. Louis area, it would be bad for my referral practice to be testifying against local physicians. If I think they have a case, I refer those attorneys to out-of-state physicians who could provide them the guidance they need.

30

Defendants did not object at this point in the questioning. Plaintiffs' counsel followed up with further questions regarding the witness's volunteered testimony that he did not act as a witness against other St. Louis doctors because doing so would be bad for his referral business. Ultimately, Plaintiffs' counsel asked, "[I]f folks in St. Louis can't get St. Louis doctors to come in and testify to the truth, what they felt in their heart, feel was handled wrong by a physician in St. Louis, how can we—how can anybody in St. Louis get the care that we are entitled to?" Before Plaintiffs' counsel finished the question, Defendants objected, arguing that the line of questioning was irrelevant and prejudicial. The trial court overruled the objection and allowed Plaintiffs' counsel to ask the question.

This Court finds no abuse of discretion here. Evidence of the interest or bias of a witness and his relation to or feeling toward a party is always relevant. *Mitchell v. Kardesch*, 313 S.W.3d 667, 676 (Mo. banc 2010). Attorneys are given wide latitude to test the qualifications, credibility, skill or knowledge, and value and accuracy of opinions given by an expert witness. *Nelson v. Waxman*, 9 S.W.3d 601, 604 (Mo. banc 2000). When he stated in court without objection that testifying against local St. Louis doctors would be bad for his referral business, the witness opened the door to further questioning. This matter was relevant to the issue of his bias in this case as he was testifying in favor of Dr. Ferrara, a St. Louis doctor.[14]

---

[14] Even if this Court were to find that the trial court erred in permitting this line of questioning, no prejudice to Defendants resulted. After Plaintiffs' counsel asked how

31

*3. The Trial Court Did Not Abuse Its Discretion By Overruling Defendants'*
*Objection to the Questioning of Dr. Ferrara*

Defendants additionally claim that the trial court abused its discretion in allowing Plaintiffs to play a portion of Dr. Ferrara's deposition and in failing to grant Defendants' motion for new trial for the same reason. In the relevant section of the deposition, Dr. Ferrara stated that he did not speak to the surgeons who performed Ms. Dodson's unsuccessful bypass surgery to inquire about the results. Defendants argue that this material was irrelevant and prejudicial. This Court disagrees.

As noted above, there is wide latitude to test the qualifications, credibility, skill or knowledge, and value and accuracy of opinions by an expert witness on cross-examination. *Nelson*, 9 S.W.3d at 604. Generally, the credibility of witnesses is always a relevant issue in a lawsuit. *Mitchell*, 313 S.W.3d at 676. Dr. Ferrara offered opinions regarding the events leading up to Ms. Dodson's death and the cause of her death. Whether he spoke with the surgeons who attempted to operate on Ms. Dodson is relevant to his credibility as a witness and the value of his opinion on those matters. The answer to this question informs the jury what information Dr. Ferrara did or did not take into account when forming his opinions. There was no abuse of discretion in admitting this videotaped testimony.

---

citizens of St. Louis could get the care they needed if St. Louis doctors were unwilling to testify against each other, the witness was allowed to explain at length that this practice was uniform across the country, and that when he received requests from medical malpractice plaintiffs, he would send them to qualified out-of-town experts who would not have any conflict of interest in testifying for the plaintiffs. There is no prejudice evident from this record.

32

*4. The Trial Court Did Not Err in Giving Instruction No. 4 to the Jury*

Defendants also argue that the trial court committed reversible error by giving instruction No. 4, which directed the jury not to consider insurance coverage while deliberating on the case.[15] Defendants claim that, because Plaintiffs introduced evidence of Ms. Dodson's health insurance benefits, the instruction was irrelevant and gratuitously injected the issue of insurance into the case. They are incorrect.

The improper injection of insurance coverage in a jury-tried case may constitute reversible error, especially if reference to the issue of insurance is done purposefully or in bad faith. *Means v. Sears, Roebuck & Co.*, 550 S.W.2d 780, 787 (Mo. banc 1977). Defendants argue that the only mention of insurance in the trial occurred when Plaintiffs introduced evidence of the decedent's health insurance benefits to establish Plaintiffs' economic damages. Plaintiffs then requested an instruction directing the jury not to consider the issue of insurance coverage. Defendants contend that, as such, instruction No. 4 served no real purpose in the case except to impermissibly and needlessly remind the jury of the existence of insurance.

Even if the testimony regarding Ms. Dodson's health insurance benefits was the only mention of insurance in the case, Defendants give no explanation as to how the instruction prejudiced them. If there is any ambiguity in giving this instruction where

---

[15] Instruction No. 4 followed verbatim the text of MAI 2.07, which reads:

> The existence or non-existence of any type of insurance, benefit, right or obligation of repayment, public or private, must not be considered or discussed by any of you in arriving at your verdict. Such matters are not relevant to any of the issues you must decide in this case.

33

loss of health insurance benefits is claimed as an element of damages by Plaintiffs, the instruction could only have inured to the benefit of Defendants because it instructs the jury to disregard the existence of the insurance.

Further, the record reflects at least two other mentions of insurance. First, during *voir dire*, a juror made unsolicited comments that insurance companies pay for medical malpractice claims and that juries often give large awards for medical malpractice plaintiffs because they know the defendant doctors and hospitals are insured. Second, a hospital bill was admitted into evidence revealing the original amount owed for Ms. Dodson's medical care as well as the amount actually paid with insurance.

MAI 2.07 is intended to prevent the jury from considering insurance coverage in cases in which such matters are irrelevant and potentially prejudicial to one or both of the parties.[16] No argument is made here that insurance coverage was a relevant issue in the case outside of Plaintiffs' calculation of their economic damages. There was no error in giving instruction No. 4 to the jury.

5. *The Trial Court Did Not Err in Overruling Defendants' Motion for Directed Verdict, for Judgment Notwithstanding the Verdict, and for a New Trial on Plaintiffs' Claim for Future Economic Damages*

Finally, Defendants argue that the trial court should have granted their motions for directed verdict, for judgment notwithstanding the verdict, and for a new trial because Plaintiffs failed to prove their future economic damages to a degree of reasonable certainty. In particular, Defendants claim that the evidence regarding Ms. Dodson's

---

[16] As comments to MAI 2.07 note, the instruction would not be appropriate in certain cases in which insurance coverage is a relevant issue at trial, such as bad faith insurance cases, vexatious refusal to pay cases, and insurance coverage cases.

34

future earning capacity and the value of her health insurance benefits was too speculative to support the jury's verdict.

A plaintiff is entitled to full compensation for past or present injuries that the plaintiff has shown by a preponderance of the evidence were caused by the defendant. *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 130-31 (Mo. banc 2007). The ultimate test for damages is whether the award will fairly and reasonably compensate the plaintiff for his or her injuries. *Sampson v. Missouri Pac. R. Co.*, 560 S.W.2d 573, 588 (Mo. banc 1978). Damages for loss of future earnings must be established with reasonable certainty through the introduction of substantial evidence. *Id.* at 589. They may not be based on conjecture or speculation. *Id.* Absolute certainty in predicting future economic damages is not required, however. *See id.* This Court has recognized that "[i]nevitably there is a degree of speculative nature to the determination of a fairly approximated present-value award compensating plaintiff for what he would have earned." *Id.* Such inherent uncertainty does not improperly influence a jury's verdict when the evidence "afford[s] the jury a basis for a reasonable estimate" of the amount of the plaintiff's future losses. *Messina v. Prather*, 42 S.W.3d 753, 765 (Mo. App. 2001).

Plaintiffs' evidence of future economic damages consisted of the testimony of Ms. Dodson's supervisor, Mr. Dodson, and an economic expert retained by Plaintiffs. The testimony indicated that the decedent, Ms. Dodson, worked as an assistant for a property management group and earned approximately $42,000 annually, that Ms. Dodson was an excellent employee, that it was reasonable to expect that Ms. Dodson would likely have received a promotion in the next year with a $3,000 pay increase, and

35

that within five years, Ms. Dodson would likely have earned as much as $55,000 per year. The testimony was based on the supervisor's 33 years of experience in the field of commercial property management and her personal knowledge of Ms. Dodson.

Mr. Dodson testified that his three children had been insured through Ms. Dodson's work because it was significantly more expensive to insure them through his employer's insurance. The expert testified that he estimated the additional cost to the family of insuring the children on Mr. Dodson's insurance policy to be about $500 per month based on the information he had been provided, and that this information was of the kind traditionally relied upon by experts in performing these calculations.

The testimony provided facts regarding Ms. Dodson's career, skills, and annual income at the time of her death from which the jury could reasonably estimate the future earnings of Ms. Dodson. This was the best evidence of these facts due to the supervisor's great experience in the field of commercial property management and her personal knowledge of Ms. Dodson's work abilities. Additionally, the expert testimony regarding Ms. Dodson's health benefits and estimated future earnings was reasonably certain and definite and was properly based on the sources economists traditionally rely on in estimating future economic damages. This testimony provided a sufficiently certain foundation upon which the jury could reasonably estimate the future economic damages suffered by Plaintiffs.

## IV. Conclusion

This Court recognizes the inadequacy of $350,000 to compensate the Dodson family for the tragic death of their loved one, particularly in light of the amount awarded

36

by the jury.  It is not for this Court to question the policy determinations of the General

Assembly, however, and the Court is bound to apply the law as written by the legislative

branch.  Accordingly, the judgment of the trial court is affirmed.


_____
Mary R. Russell, Judge


Breckenridge, C.J., and Stith, J., concur; Fischer and Wilson, JJ., concur in result in
separate opinion filed; Draper, J., dissents in separate opinion filed; Teitelman, J.,
concurs in opinion of Draper, J.; Teitelman, J., dissents in separate opinion filed.



# SUPREME COURT OF MISSOURI
# en banc

JASON D. DODSON and JASON D.      )
DODSON, JR., a Minor, and EVA RAINE     )
DODSON-LOHSE, a Minor, and        )
AUGUST WILLIAM DAVIS DODSON,    )
a Minor, said Minors appearing by the     )
duly appointed Next Friend          )
JASON D. DODSON,            )
                               )
      Respondent/Cross-Appellant,    )
                               )
v.                                )     No. SC95151
                               )
ROBERT P. FERRARA, M.D., and     )
 MERCY CLINIC HEART and        )
 VASCULAR, L.L.C.,           )
                               )
      Appellants/Cross-Respondents.   )

### SEPARATE OPINION

We concur with the result in the principal opinion but write separately to address

Plaintiffs' argument that *Sanders v. Ahmed*, 364 S.W.3d 195 (Mo. banc 2012), does not

control in this case. For the reasons set forth below, *Sanders* controls, and we are

constrained to vote accordingly.

The issue in this case is whether the constitutional right to a jury trial prohibits the

legislature from capping the amount of noneconomic damages recoverable in a statutorily

created cause of action. In answering this question, the Court does not write upon a blank

slate. The nature and extent of the constitutional right to a jury trial in civil cases has been litigated often in this Court in recent years. In *State ex rel. Diehl v. O'Malley*, 95 S.W.3d 82 (Mo. banc 2003), this Court held that the trial court erred in not allowing the jury to determine the plaintiff's damages in a claim brought under the Missouri Human Rights Act. *Diehl*, therefore, did not address the question of statutory caps on damages. Instead, it addressed only whether the plaintiff had a constitutional right to a jury trial. The Court held that the plaintiff had that right.

> Diehl has filed a civil action, for damages only, under the Missouri Human Rights Act. This action is neither equitable nor administrative in nature. Diehl's civil action for damages for a personal wrong is the kind of case triable by juries from the inception of the state's original constitution. The respondent judge's order overruling Diehl's request for a jury trial denied her constitutional right to trial by jury under article I, sec. 22(a) of the Missouri Constitution.

*Id*. at 92.

In *Scott v. Blue Springs Ford Sales, Inc.*, 176 S.W.3d 140 (Mo. banc 2005), the Court again faced the question of whether a plaintiff has a constitutional right to have the jury determine the propriety and amount of punitive damages even though the claim was statutory (i.e., under the Missouri Merchandising Practices Act ("MMPA")). Referring to *Diehl*, *Scott* states:

> The Court explained that in applying the right to trial by jury, the question is whether the proceeding is analogous to an action at common law or whether it is in the nature of a suit in equity, and that, from the status of the right as of 1820, the simple analysis is whether the action is a civil action for damages. If so, the jury trial right is to remain inviolate. Applying these rules, the Court then held that the constitutional right to trial by jury applies even in a statutory action if the statutory remedy is damages because the statutory action is indeed a civil action for damages.

*Scott*, 176 S.W.3d at 142 (citations omitted).  Accordingly, *Scott* – like *Diehl* – holds that "a statute is not valid that provides for punitive damages but precludes a jury trial to determine those damages."  *Id.*

The broad distinction drawn in *Diehl* and *Scott* between claims for damages (to which the constitutional jury trial right attaches) and equitable or administrative claims (to which the constitutional right does not attach) was applied faithfully by this Court as long as the question remained whether the legislature could take away the right to a jury trial in a common law or statutory cause of action.  *See Nitro Distrib., Inc. v. Dunn*, 194 S.W.3d 339, 352 (Mo. banc 2006) ("In civil actions, of course, the right to trial by jury attaches only to actions at law for which damages may be awarded, not to suits in equity."); *Netco, Inc. v. Dunn*, 194 S.W.3d 353, 362 (Mo. banc 2006) (same).  This distinction was not applied, however, when the Court approached the decidedly different question of whether the constitutional right to a jury trial prohibited the enforcement of legislatively enacted caps on damages recoverable under common law or statutory causes of action.

In *Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364 (Mo. banc 2012), as in *Scott*, the Court was faced with a claim for punitive damages under the MMPA.  But, even though *Scott* holds that the constitutional right to a jury trial attaches to such a claim, *Overbey* holds that this constitutional right is no bar to the enforcement of legislatively enacted caps on the amount of punitive damages recoverable in a statutory cause of action.

[T]he Overbeys chose to bring a statutory claim under the MMPA rather than a common law fraud claim. The substance of their claim, therefore, must be determined by reference to the MMPA rather than by reference to the common law. *Scott* teaches that the legislature could not take from the Overbeys their right to have the jury rather than a judge determine whether they had met their burden of proof as to actual or punitive damages once the legislature had provided that plaintiffs are permitted to recover such damages under the MMPA. But the legislature did not permit unlimited recovery of such damages under the MMPA or under any statute. It chose instead to enact section 510.265, which limits the substantive right of recovery of punitive damages to a maximum of $500,000 or five times actual damages, whichever is greater.

The legislature, in so doing, at least in regard to a statutorily created cause of action such as the MMPA, did not "intervene in the judicial process" or "establish a procedure for adjudicating a substantive claim" in the manner prohibited by *Scott* but rather limited "the substance of the claims themselves," as it has a right to do in setting out the parameters of a statutory cause of action. Indeed, it could have precluded recovery of punitive damages altogether. For this reason, application of the limits in section 510.265 to the Overbeys' recovery of punitive damages under the MMPA does not violate their right to jury trial under article I, section 22(a) of the Missouri Constitution.

*Id.* at 376 (citations omitted).

As a result, *Overbey* makes it clear that the analysis in *Diehl* and *Scott* – an analysis that focuses solely on whether a cause of action (statutory or common law) is one for damages rather than an equitable claim or administrative action – is not the analysis to be used in determining whether the constitutional right to a jury trial bars enforcement of legislatively enacted caps on the amount of damages recoverable under a statutory cause of action. Instead, in *Overbey*, the Court held that such caps would be enforced even though the constitution protected the right to a jury trial. *Id.*

*Sanders* reinforced this point. There, the Court held that – because wrongful death was a statutory cause of action – the constitutional jury trial right did not prohibit the

4

enforcement of legislatively enacted caps on the amount of noneconomic damages recoverable in such an action. *Sanders* had no cause to address whether a plaintiff has a constitutional right to a jury trial to determine damages (including noneconomic damages). If it had, presumably it would have followed *Diehl* and *Scott* in holding that the plaintiff has that right. But the question of the constitutional validity of statutory caps on the amount of damages recoverable under a statutory cause of action requires a different analysis, and this Court held in *Sanders* – as it did in *Overbey* – that such caps are not unconstitutional and will be enforced even though the plaintiff has a constitutional right under *Diehl* and *Scott* to a jury trial subject to whatever caps the legislature may decide to impose.

Plaintiffs in the present case contend that *Sanders* was overruled by *Watts v. Lester E. Cox Medical Centers*, 376 S.W.3d 633 (Mo. banc 2012). This is incorrect. First, the principal opinion in *Watts* does not mention *Sanders*, and this Court is loath to consider its precedents to have been overruled by implication. *See State v. Honeycutt*, 421 S.W.3d 410, 422 (Mo. banc 2013) ("this Court presumes, absent a contrary showing, that an opinion of this Court has not been overruled *sub silentio*"). Second, and more importantly, *Watts* could not have overruled *Sanders* because the issue before the Court in *Watts* was the constitutional validity of statutorily enacted caps on the amount of damages recoverable under a common law theory. *Sanders*, on the other hand, dealt with the constitutional validity of such caps on the amount of damages recoverable under a statutory cause of action, and *Overbey* and *Sanders* emphasize that the two issues are to be treated differently.

5

*Lewellen v. Franklin*, 441 S.W.3d 136 (Mo. banc 2014), reinforces this distinction. There, the plaintiff sought recovery for actual and punitive damages, both under the MMPA and for common law fraud. The jury awarded $25,000 in actual damages and $1 million in punitive damages on each claim. The plaintiff did not challenge the application of the caps in section 510.265, RSMo Supp. 2013, to the punitive damages award under the MMPA because *Overbey* previously held that caps on the amount of damages recoverable under a statutory cause of action were not unconstitutional. *Id.* at 142 n.9. The plaintiff in *Lewellyn* did challenge the application of section 510.265 to the punitive damages award on the common law fraud claim, however, and *Lewellen* – bound by *Watts* – held that the constitution prohibits the enforcement of statutory caps on the amounts recoverable on a common law claim. *Id*. at 144.

Now, the Court returns to the precise question that was decided in *Sanders*, i.e., whether the constitution prohibits the enforcement of statutory caps on the amounts recoverable under a statutory cause of action. *Sanders* holds that it does not, and this Court is bound to follow *Sanders* in this case.

Judge Teitelman's dissent in this case argues that the Court must apply the same analysis used in *Diehl* and *Scott* to decide whether the constitutional right to a jury trial prohibits the enforcement of statutory caps on the amounts that may be recovered under a statutory cause of action. But that analysis has never been used to answer this question. *Diehl* and *Scott* did not address the constitutional validity of statutory caps on damages recoverable under statutory causes of action but, instead, determined that the legislature could not take away the plaintiff's right to a jury trial regardless of whether the claim was

a common law or statutory cause of action. *Overbey* and *Sanders* make clear, however, that the plaintiff's constitutional right to a jury trial does not preclude the enforcement of statutory caps on the amount that may be recoverable. The former is a question of procedure, which the constitution protects, while the latter is a question of the contours of the substantive right to recover, which the legislature alone must decide. *See Overbey*, 361 S.W.3d at 376 ("The legislature, in so doing [enacting the caps], at least in regard to a statutorily created cause of action such as the MMPA, did not 'intervene in the judicial process' or 'establish a procedure for adjudicating a substantive claim' in the manner prohibited by *Scott* but rather limited 'the substance of the claims themselves,' as it has a right to do in setting out the parameters of a statutory cause of action.") (citations omitted).

The argument made in Judge Teitelman's dissent in this case was made by the dissent in *Overbey* and rejected by the Court in that case. The argument made in Judge Teitelman's dissent in this case also was made by the dissent – and rejected by the Court – in *Sanders*. Now, the Court must again reject this argument and hold that – under *Overbey*, *Sanders*, *Watts*, and *Lewellyn* – the constitutional validity of legislatively enacted caps turns on whether the legislature is attempting to limit recovery on a common law cause of action (which the constitutional jury trial right does not allow) or under a statutory cause of action (which the constitution permits). This is so even though *Diehl* and *Scott* hold that the right to a jury trial applies in both cases.

If the analysis in *Diehl* and *Scott* were the proper way to determine the constitutional validity of legislative caps on statutory causes of action, as Judge

Teitelman's dissent argues it should be, we would be compelled to vote with Judge Teitelman's dissent in this case. But, if the analysis in *Diehl* and *Scott* were the proper way to determine the constitutional validity of legislative caps on statutory causes of action, the Court could not have reached the results it did in *Overbey* and *Sanders*. As a result, we can reach no conclusion other than to follow *Overbey* and *Sanders* and hold that the constitutional right to jury trial does not prohibit the enforcement of legislative caps on the amounts recoverable under a statutory cause of action.

The question is not whether we believe *Diehl*, *Scott*, *Overbey*, *Sanders*, *Watts*, or *Lewellyn* were correctly decided. The holdings of *Diehl* and *Scott* that the constitutional jury trial right applies in all cases whether the claim arises under the common law or by statute – and the line drawn in *Overbey*, *Sanders*, *Watts*, and *Lewellyn* that the constitutional jury trial right prohibits the enforcement of statutory caps on amounts recoverable on a common law cause of action but is not offended by such caps on amounts recoverable under a statutory cause of action – are authoritative constructions of one of our most important constitutional rights. They have been applied faithfully by this Court and have engendered substantial reliance by the General Assembly and other stakeholders. Accordingly, these cases cannot be ignored or overruled without a substantial showing that they were incorrectly decided or that they reached a proper result on improper grounds. No such showing has been made here.

_____            _____

Zel M. Fischer, Judge                                            Paul C. Wilson, Judge

8



# SUPREME COURT OF MISSOURI
## en banc

JASON D. DODSON, and JASON D.   )
DODSON, JR., a Minor, and EVA RAINE  )
DODSON-LOHSE, a Minor, and    )
AUGUST WILLIAM DAVIS DODSON,  )
a Minor, said Minors appearing by their  )
duly appointed Next Friend,     )
JASON D. DODSON,       )
               )
  Respondent/Cross-Appellant,   )
               )
v.             )  No. SC95151
               )
ROBERT P. FERRARA, M.D. and   )
 MERCY CLINIC HEART and    )
 VASCULAR, LLC,       )
               )
  Appellants/Cross-Respondents.   )

## DISSENTING OPINION

I dissent from the principal opinion. In *Adams By and Through Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898 (Mo. banc 1992),[1] this Court summarized the arguments supporting and refuting whether the legislature's imposition of the damages cap in section 538.210, RSMo 1986, was rationally related to its intended purpose of

---

[1] *Adams* was overruled on other grounds by *Watts v. Lester E. Cox Med. Centers*, 376 S.W.3d 633 (Mo. banc 2012).

alleviating the perceived malpractice insurance "crisis" that occurred in Missouri in the early 1980s. This Court recognized, "Both sides offer an array of evidence that both supports and refutes the existence of a 'crisis' in medical malpractice premiums – enough evidence, in fact, that at the very least, it is a debatable proposition that such a crisis does in fact exist." *Adams*, 832 S.W.2d at 904. The existence of a "crisis" was questioned again in 2010 by Judge Wolff in *Klotz v. St. Anthony's Medical Center*, 311 S.W.3d 752 (Mo. banc 2010), in which he opined, "The General Assembly enacted the limits on noneconomic damages in response to what it perceived as a serious problem in the tort and insurance liability system … [in] that the legislature considered malpractice litigation to be a crisis, but it seems a rather slow-moving crisis, more a trickle than a flood." *Klotz*, 311 S.W.3d at 773.

A clear, cogent argument exists that this medical malpractice "crisis" was manufactured and continues to be exacerbated today by a special interest group that persistently labels, for shock value, and characterizes some jurisdictions as "judicial hellholes." These characterizations and the underlying "support" for these characterizations have been criticized roundly. *See e.g., Adam Liptak, The Worst Courts for Business? It's a Matter of Opinion*, N.Y. TIMES, December 24, 2007, at A10; Douglas A. Kysar, Thomas O. McGarity, and Karen Sokol, *Medical Malpractice Myths and Realities: Why an Insurance Crisis is not a Lawsuit Crisis*, 39 Loy. L.A. L. Rev. 785, 804 (August 2006); and Elizabeth G. Thornburg, *Judicial Hellholes, Lawsuit Climates and Bad Social Science: Lessons from West Virginia*, 110 W. VA. L. Rev. 1097, 1103 (Spring 2008). Despite the clearly faulty premise, this special interest group's

2

tactics are effective at achieving its desired purpose: To appeal to the voting public, to scare state politicians into making changes in the law in order to ameliorate the fabricated "judicial hellhole" label, and to oust judges whose rulings do not comport or align with the group's purported interests. *Judicial Hellholes,* 110 W. VA. L. REV. at 1103.

It should be noted our legislature took subsequent remedial measures in the 2015 session to amend section 538.210 to increase the noneconomic damages caps for personal injury and wrongful death, including an adjustment to account for inflation. 2015 Mo. Legis. Serv. S.B. 239 (West).[2] Perhaps these subsequent remedial measures serve as recognition that the perceived "crisis" never existed, or at least has abated.

The foregoing argument could have been asserted to challenge section 538.210 under a rational basis test, but it was not raised here. I respectfully dissent.

_____

GEORGE W. DRAPER III, JUDGE

---

[2] However, I express no opinion as to the validity of these changes because the amendment is not before the Court in this case.



# SUPREME COURT OF MISSOURI
# en banc

JASON D. DODSON, and JASON D. )
DODSON, JR., a Minor, and EVA RAINE )
DODSON-LOHSE, a Minor, and )
AUGUST WILLIAM DAVIS DODSON, )
a Minor, said Minors appearing by their )
duly appointed Next Friend, )
JASON D. DODSON, )
 )
      Respondent/Cross-Appellant, )
 )
v. ) No. SC95151
 )
ROBERT P. FERRARA, M.D. and )
MERCY CLINIC HEART and )
VASCULAR, LLC, )
 )
      Appellants/Cross-Respondents. )
 )

## DISSENTING OPINION

I respectfully dissent. The principal opinion holds that the section 538.210(1), RSMo Supp. 2013, cap on noneconomic damages does not violate the right to a trial by jury as applied to wrongful death medical malpractice claims. This holding is premised on the conclusion that wrongful death actions are statutory and did not exist at common

law. That may be true, but the issue is not whether the modern statutory wrongful death action is mirrored in the common law. The issue is whether the modern statutory cause of action for wrongful death is "analogous to" a common law cause of action. *State ex rel. Diehl v. O'Malley*, 95 S.W.3d 82, 86 (Mo. banc 2003). The Dodsons' statutory wrongful death action is analogous to the common law cause of action typified by *James v. Christy*, 18 Mo. 162 (1853), in which a child was killed due to negligence and the father's estate was allowed to pursue a civil action for damages. Therefore, the Dodson family has a right to a jury trial as guaranteed by article I, section 22(a) of the Missouri Constitution. Applying the section 538.210 damage cap violates that right. *Watts v. Lester E. Cox Medical Centers*, 376 S.W.3d 633, 638 (Mo. banc 2012). The judgment should be reversed to the extent that it applies the damage cap to the jury's award of noneconomic damages.

Article I, section 22(a) is one of the fundamental guarantees of the Missouri Constitution, providing "the right of trial by jury as heretofore enjoyed shall remain inviolate ...." *Watts*, 376 S.W.3d at 637. "The right to trial by jury ... is a constitutional right, [and it] applies 'regardless of any statutory provision,' and is 'beyond the reach of hostile legislation.'" *Diehl*, 95 S.W.3d at 92 (quoting *Lee v. Conran*, 111 S.W. 1151, 1153 (Mo. 1908)). In this case, the statutory damage cap violates the state constitutional right to trial by jury because: (1) the Dodsons' wrongful death action and claim for noneconomic damages is within "the right of trial by jury as heretofore enjoyed," and (2) the Dodsons' right to trial by jury does not remain "inviolate" after application of the statutory cap on noneconomic damages. *Watts*, 376 S.W.3d at 637-638.

**I. The right to trial by jury includes statutory wrongful death actions**

"The phrase 'heretofore enjoyed' means that '[c]itizens of Missouri are entitled to a jury trial in all actions to which they would have been entitled to a jury when the Missouri Constitution was adopted' in 1820." *Id*. at 638 (quoting *Diehl*, 95 S.W.3d at 85). The jury trial right is also defined by common law limitations on the amount of a jury's damage award. *Watts,* 376 S.W.3d at 638, citing *Klotz v. St. Anthony's Med. Ctr*., 311 S.W.3d 752, 775 (Mo. banc 2010) (J. Wolff, concurring).

Although the common law is the analytical benchmark, the fundamental constitutional right to a jury trial is not limited to the precise contours of the common law circa 1820. Instead, the constitutional right to a jury trial attaches to a modern statutory cause of action when the statutory cause of action is a civil action for damages that is "analogous to" or a "modern variant of" the kinds of cases triable by juries when the Missouri Constitution was originally adopted. *Diehl,* 95 S.W.3d at 87, 92; *see also Briggs v. St. Louis & S.F. Ry*. Co., 20 S.W. 32, 33 (Mo. 1892) (the constitutional right to a jury trial "is implied in all cases in which an issue of fact, in an action for the recovery of money only, is involved, whether the right or liability is one at common law or is one created by statute.").[1] *Diehl* illustrates the application of this analysis to modern statutory actions.

---

[1] The principal opinion cites *Hammons v. Ehney*, 924 S.W.2d 843, 848 (Mo. banc 1996), for the proposition that the phrase "heretofore enjoyed" means that "the constitution protects the right as it existed when the constitution was adopted and does not provide a jury trial for proceedings subsequently created." This statement of the law is correct, but misleading in the context of this case. For instance, as explained below, this Court recognized in *Diehl* that the plaintiff had a constitutional right to a trial by jury in her subsequently created statutory claim for age and sex

3

In *Diehl*, this Court held that the right to trial by jury attached to a statutory age and sex employment discrimination claim. The right to a jury trial did not apply due to the existence of early 19th century common law precedent recognizing a woman's right to sue for age and sex based employment discrimination. Rather, Ms. Diehl had a right to a jury trial because her statutory civil action for damages was "analogous to" the type of cases triable by juries in 1820. *Id.* at 87. By focusing on the existence of analogous common law causes of action, the jury trial analysis as explained in *Diehl* ensures that the right to a jury trial as "heretofore enjoyed" in fact remains "inviolate" as it limits the legislature's power to statutorily restrict the right to a jury trial by simply re-casting common law damages as statutory damages. *Watts*, 376 S.W.3d at 640. If, as the principal opinion implies, the right to a jury trial is precisely coextensive with the common law causes of action recognized in 1820, then the practical vitality of this fundamental constitutional right will wither according to legislative whim and as the law evolves to mediate disputes unforeseen in the early 19th century.

The Dodsons' statutory wrongful death claim, like the statutory discrimination claims at issue in *Diehl*, is analogous to common law causes of action that traditionally carried the right to a jury trial because it seeks redress for wrongs to a person. In *James v. Christy*, a father filed a civil action to recover money damages after his son was killed due to the defendant's negligence. 18 Mo. at 163. The father died during the pendency of the suit. This Court permitted the father's estate to recover the value of the son's

---

discrimination even though there was no proof of a common law action for age or sex based employment discrimination.

4

services.   Allowing recovery of the value of the son's services is analogous to the economic damages recoverable in a modern, statutory wrongful death action.   This Court then noted that the estate was not entitled to "to any remuneration for the loss of the society or comforts afforded by a child to his parent.  Damages of this character died with the parent …." *Id*. at 164.  In other words, while the father's estate - an inanimate legal entity -- could not recover noneconomic damages due to the boy's death, the father would have been entitled to damages for the "loss of society or comforts" due to his son's death. This Court's untroubled discussion of the matter in *James* establishes that Missouri common law permitted actions that are plainly "analogous to" the modern statutory wrongful death action and that the recovery in these actions included noneconomic damages.[2]

Despite the fact that *James* unequivocally permitted the recovery of damages for loss of services, while also noting that the law recognized noneconomic damages for "loss of society and comforts," the majority opinion discounts *James* because it "is not the same as an action for the wrongful death of his son." *Majority opinion, pg. 15*.  As established, the fact that the action in *James* is not identical to the modern, statutory wrongful death action is irrelevant, just as it was irrelevant in *Diehl* that there was no apparent common law precedent recognizing a woman's right to sue for sex discrimination in the workplace.  The right to a jury trial in a modern statutory action is

---

[2] The first medical malpractice case in the United States involved a husband's claim for damages after his wife died during a surgical procedure.  *Cross v. Guthery*, 2 Root 90, 1794 WL 198 (Conn. Super. 1794); *McCullum v. Tepe*, 693 F.3d 696, 702 (6th Cir. 2012) (*Cross* was the "first reported American medical-malpractice case").

5

not dependent on the existence of an identical common law cause of action. *Diehl* plainly holds that the appropriate analysis is whether the modern statutory wrongful death action is "analogous to" or a "modern variant of" a common law civil action for damages that was triable by jury in 1820.

As the principal opinion notes, there are a number of cases asserting that the common law did not recognize a cause of action for wrongful death. This observation does not, however, negate the existence of analogous common law actions permitting the recovery of damages for a death caused by the negligence of another. To the contrary, in *Sullivan v. Carlisle*, 851 S.W.2d 510, 513 (Mo. banc 1993), this Court observed that the modern, statutory cause of action for a wrongful death action "was designed to compensate specifically designated relatives for the loss of the decedent's economic support." This is precisely what happened in *James v. Christy* when this Court specifically permitted the father's estate to recover the loss of the son's services. Whether that loss is characterized as a loss of a property interest, a personal interest, or any other type of interest one can conjure, the fact remains that *James* evidences that the common law permitted the recovery of money damages sustained when negligence results in the death of a loved one. The Dodson family has a right to a jury trial on their statutory wrongful death action. The dispositive issue is whether application of the cap violates that right.

## II. Application of the statutory cap violates the right to a jury trial

"Missouri law always has recognized that 'the jury's role in a civil case is to determine the facts relating to both liability and damages and to enter a verdict

6

accordingly.'" *Watts*, 376 S.W.3d at 640, quoting *Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 382 (Mo. banc 2012). The amount of noneconomic damages is a fact that must be determined by the jury and is subject to the protections of the article I, section 22(a) right to trial by jury. *Watts*, 376 S.W.3d at 640. Once the right to a trial by jury attaches, as it does in this case, the plaintiff has the full benefit of that right free from the reach of hostile legislation. *Id.* Section 538.210 imposes a cap on the jury's award of noneconomic damages that operates wholly independent of the facts of the case and, therefore, directly curtails the jury's determination of damages. "The individual right to trial by jury cannot 'remain inviolate' when an injured party is deprived of the jury's constitutionally assigned role of determining damages according to the particular facts of the case." *Id.*

The principal opinion sidesteps the fact that the cap violates the Dodsons' right to a jury trial by asserting that *Sanders v. Ahmed*, 364 S.W.3d 195, 203 (Mo. banc 2012), establishes that the legislature is free to modify a cause of action it created. The legislature is of course free to modify a cause of action it created, but it is equally obvious that this power is subject to constitutional limitations. Specifically, once the right to a jury trial attaches, as it does in this case, then exercise of that right is "beyond the reach of hostile legislation," including statutory caps on a jury's damage award. *Watts*, 376 S.W.3d at 640. Although *Sanders*, decided prior to *Watts*, held that caps on noneconomic damages in wrongful death actions do not violate the right to a jury trial, this rationale is incorrect because it authorizes legislative curtailment of individual constitutional rights. *Sanders* was wrongly decided.

7

The judgment should be reversed to the extent that it applies the damage cap to the jury's award of noneconomic damages.

_____
Richard B. Teitelman, Judge