Nicole ADAMS, a minor, By and Through her legal guardian and next friend, Julia Alice ADAMS, and Julia Alice Adams, individually, Appellants,

v.

The CHILDREN'S MERCY HOSPITAL, et al., Respondents.

No. 73867.

Supreme Court of Missouri, En Banc.

May 19, 1992.

Rehearing Denied June 30, 1992.

Gary C. Robb and Anita Porte Robb, Kansas City, for appellants Adams.

Timothy M. Aylward, Sally L. Thieman and Cynthia L. Dillard, Kansas City, for respondent Children's Mercy Hosp.

Thomas M. Sutherland, Janet M. Simpson and Reid F. Holbrook, Merriam, Kan., for respondent Jelinek, M.D.

Lori Andrews and Cynthia Morgan, Chicago, Ill., for amicus curiae People's Med. Soc.

Ronald R. McMillin, Lori J. Levine; and Richard S. Brownlee, III, Jefferson City, for amicus curiae Missouri Hosp. Ass'n.

ROBERTSON, Chief Justice.

This appeal from a judgment in a medical malpractice suit challenges, among other things, the constitutionality of portions of this state's legislative response to increases

in the cost of health care services resulting from a perceived medical malpractice insurance crisis. We have jurisdiction. Mo. Const. art. V, § 3. We conclude that the challenged provisions of Chapter 538, RSMo 1986, are constitutional.[1] The remaining issues are transferred to the Court of Appeals, Western District, for appellate review.

## I.

Proper medical care has the power to restore, to turn a temporary tragedy into a triumph over disease and injury; negligently provided medical care has the power to destroy, to turn a temporary trauma into a permanent tragedy. In this case, medical negligence did not make whole; it ripped a life asunder; it turned the trauma of household burns into the tragedy of total dependence, of brain damage, of a severe and permanent handicap.

On March 25, 1988, Nicole Adams, a gifted eight-year-old, practiced in her family kitchen a singing and dancing routine for an upcoming recital. Julia Alice Adams, Nicole's mother, watched Nicole dance as she prepared the evening meal. The dance routine took Nicole near the stove. She struck the handles of two skillets, which overturned, dumping hot grease and frying hamburgers onto the right side of Nicole's body.

Mrs. Adams rushed Nicole to Children's Mercy Hospital (the Hospital). The Hospital admitted Nicole and scheduled her for skin graft surgery on March 30, 1988. That morning, Dr. Ronald Sharp performed the skin graft surgery. Anesthesia Associates of Kansas City, Inc. (Anesthesia Associates), which operated the Hospital's anesthesia department under contract with the Hospital, assigned Dr. Jane Jelinek–Boozalis (Dr. Jelinek), an anesthesia resident from the University of Kansas Medical Center, to the case. Dr. Robert Binda and Dr. Peter Mestad, both of Anesthesia Associates, supervised Dr. Jelinek.

During the operation Nicole received 7,000 cc's—7 liters—of crystalloid solution intravenously. Crystalloid is a saline solution of 99 percent water and 1 percent other dissolved substances. It is used to replace body fluid lost during surgery. A person of Nicole's weight (approximately 60 pounds) would normally receive no more than 2,350 cc's of crystalloid.

The introduction of such a massive amount of fluid caused Nicole's body to swell. In the recovery room, Dr. Mestad, who supervised Nicole's anesthesia recovery and who was aware of the amount of crystalloid Nicole had received during the procedure, removed the endotracheal tube from Nicole. This tube served to protect Nicole's airway. Once Dr. Mestad removed the tube, fluid-induced swelling closed Nicole's trachea. Respiratory and cardiac failure followed. No oxygen reached Nicole's brain for approximately six minutes.

Nicole is now cortically blind. She suffers motor disabilities which cause her to walk very clumsily and awkwardly. She can barely move her fingers in a coordinated manner or in any intended sequence. Her brain is significantly damaged; she now has epilepsy; she can no longer add two plus two. She will never be able to function independently or support herself by working.

The jury returned a verdict against the health care defendants and apportioned fault as follows:

| | |
|---|---|
| Children's Mercy Hospital | 20% |
| Nurse Rousher | 0% |
| Nurse Dooley | 0% |
| Dr. Jelinek | 18% |
| Dr. Sharp | 2% |
| Dr. Binda | 10% |
| Dr. Mestad | 50% |
| Dr. Powers | 0% |

The jury assessed the Adamses' total damages in excess of $20 million. That amount included over $13 million in "noneconomic" damages. The trial court reduced the judgment as directed by Section 538.210.

**1.** All statutory references are to RSMo 1986 unless otherwise indicated.

The Adamses and the Hospital filed motions for new trial and, when those were not successful, appealed. Dr. Jelinek failed to move for a new trial. She now seeks plain error review.

## II.

On appeal, this Court decides only the constitutional questions raised in the Adamses' appeal. The Adamses contend that those portions of Section 538.210 limiting noneconomic damages; of Section 538.220 permitting payment of future damages in periodic or installment payments; and of Section 538.230.2 modifying joint and several liability violate a host of provisions of the Missouri Constitution: (1) the open courts provision, Mo.Const. art. I, § 14; (2) right to trial by jury, Mo.Const. art. I, § 22(a); (3) equal rights and opportunities, Mo.Const. art. I, § 2; (4) due process, Mo. Const. art. I, § 10; (5) special law, Mo. Const. art. III, § 40(28); (6) privileges and immunities, Mo.Const. art. I, § 13; (7) one subject requirement, Mo.Const. art. III, § 23; (8) separation of powers, Mo.Const. art. III, § 1; and (9) the constitutional directives for amending statutes, Mo.Const. art. III, § 28. In due course, we will consider plaintiffs' constitutional claims. First, however, it is necessary to lay out the factual background upon which plaintiffs found those claims.

### A.

The jury returned its verdict in this case in favor of plaintiffs Nicole Adams and her mother, Julia Alice Adams, in the following amounts:

For Nicole Adams:

| | |
|---|---|
| Past Economic Damages | $ 141,379.00 |
| Future Economic Damages | $ 760,042.00 |
| Future Medical Damages | $ 4,947,311.00 |
| Past Non–Economic Damages | $ 3,905,000.00 |
| Future Non–Economic Damages | $ 10,000,000.00 |
| Total Damages | $ 19,750,732.00[2] |

For Julia Alice Adams:

| | |
|---|---|
| Past Non–Economic Damages | $ 250,000.00 |
| Future Non–Economic Damages | $ –0– |
| Total Damages | $ 250,000.00 |

But for the intervention of Chapter 538, plaintiffs claim that the judgment entry should be as follows:

| | |
|---|---|
| VERDICT FOR NICOLE ADAMS | $ 19,750,732.00 |
| Less: Present Value of Settlements | – 4,500,000.00 |
| Paid to Date | $ 15,250,732.00 |

2. The numbers reported here are taken from the jury's findings in Verdict A. The jury incorrectly added Nicole Adams' Total Damages. The actual total of the itemized damages found by the jury is $19,753,732.00.

Plus: Pre– and Post–Judgment Interest
Pursuant to Section 408.040
(1/9/90 to 10/9/91)     +    2,494,638.00

TOTAL JUDGMENT FOR
NICOLE ADAMS      $   17,745,370.00

   (Not Including Court Costs)

VERDICT FOR
JULIA ALICE ADAMS      $     250,000.00

Less: Present Value of Settlements      –    1,005,779.00

TOTAL JUDGMENT FOR
JULIA ALICE ADAMS      $     –0–

---

Applying Chapter 538 to the jury's verdict in this case, the trial court entered judgment as follows:

### VERDICT FOR NICOLE ADAMS:

| | | |
|---|---|---:|
| Total Economic Damages | $ | 5,848,732.00 |
| Less: Medical Bills Paid by The Children's Mercy Hospital | – | 28,232.25 |
| Less: Medical Bills Absorbed by The Children's Mercy Hospital | – | 114,184.52 |
| Net Economic Damages | $ | 5,706,315.00 |
| TOTAL NON–ECONOMIC DAMAGES | $ | 13,905,000.00 |
| Total Economic Damages: ($5,848,732.00 × .38)[3] | $ | 2,222,518.16 |
| TOTAL NON–ECONOMIC DAMAGES: ($430,000.00 × 2 defendants) | $ | 860,000.00 |
| TOTAL JUDGMENT FOR NICOLE: (Not Including Court Costs) | $ | 3,082,518.16 |

---

Section 538.210 provides:

In any action against a health care provider for damages for personal injury or death arising out of the rendering of or the failure to render health care services, no plaintiff shall recover more than three hundred fifty thousand dollars per occurrence for non-economic damages from any one defendant.[4]

Section 538.220 permits any party to a medical malpractice action to request, before entry of the judgment, that the court order that "future damages be paid in whole or in part in periodic or installment payments if the total award of damages in the action exceeds $100,000.00." The statute requires the paying party to post sufficient security to assure payment of the judgment.

Section 538.230.2 modifies joint and several liability. "[A]ny defendant against whom an award of damages are made shall

---

3. The total fault assessed to released persons equals 62 percent, leaving only 38 percent of the fault apportioned among present defendants.

4. Section 538.210.4 permits the court to adjust the cap for inflation. At the time of this trial, the cap had risen from $350,000 to $430,000.

be jointly liable only with those defendants whose apportioned percentage of fault is equal to or less than such defendant."

### B.

▉ A statute is presumed to be constitutional and will not be held to be unconstitutional unless it clearly and undoubtedly contravenes the constitution. A statute will be enforced by the courts unless it plainly and palpably affronts fundamental law embodied in the constitution. *Blaske v. Smith & Entzeroth, Inc.*, 821 S.W.2d 822, 828 (Mo. banc 1991), *citing Winston v. Reorganized School District R–2, Lawrence County*, 636 S.W.2d 324, 327 (Mo. banc 1982). When the constitutionality of a statute is attacked, the burden of proof is upon the party claiming that the statute is unconstitutional. *Blaske*, 821 S.W.2d at 828–29, *citing Schnorbus v. Director of Revenue*, 790 S.W.2d 241, 243 (Mo. banc 1990).

### C.

### Equal Protection

▉ The Adamses claim that the challenged provisions of Chapter 538 deny them equal protection of the laws as required by the Fourteenth Amendment of the United States Constitution and article I, section 2, of the Missouri Constitution.

▉ Equal protection analysis requires the court to determine initially whether the classification burdens a "suspect class" or impinges upon a "fundamental right." If it does neither, the statute will survive an equal protection challenge if its classifications are rationally related to a legitimate state interest. *Mahoney v. Doerhoff Surgical Services*, 807 S.W.2d 503, 512 (Mo. banc 1991); *Blaske*, 821 S.W.2d at 829. "Fundamental rights" include, but are not limited to, freedom of speech, freedom of the press, freedom of religion, the right to vote, the right to personal privacy and other basic liberties. *Mahoney*, 807 S.W.2d at 512; *Blaske*, 821 S.W.2d at 829; *State Board of Registration v. Giffen*, 651 S.W.2d 475, 479–80 (Mo. banc 1983). A "suspect" classification "is one which is inherently suspect in a constitutional sense. These are classes such as those based upon race, national origin or illegitimacy, which, because of historical reasons, need special protection from a political process controlled by the majority." *Blaske*, 821 S.W.2d at 829, *citing Mahoney*, 807 S.W.2d at 512.

▉ The Adamses claim that the right to a trial by jury, the right to open courts and the right to a certain remedy are "fundamental rights" and that victims of medical malpractice are a "suspect class." The latter assertion is without support in either law or reason. We reject the notion that victims of medical malpractice are a suspect class. *Mahoney*, 807 S.W.2d at 512.

Even were we to accept the Adamses' argument that rights to trial by jury, open courts and certain remedies are fundamental rights for the sake of argument, as the discussions at II, D and E, *infra*, show, those rights are not violated by the challenged provisions of Chapter 538.

▉ Because neither a denial of a fundamental right nor a suspect class is present in this case, the challenged statutory provisions will be upheld if rationally related to a legitimate state interest. *Mahoney*, 807 S.W.2d at 512. Rational basis review is minimal in nature. *Schnorbus*, 790 S.W.2d at 243. A statutory classification will be upheld if "any state of facts reasonably may be conceived to justify it." *Mahoney*, 807 S.W.2d at 512. Under a rational basis review, a court will strike down the challenged legislation "only if the classification rests on grounds wholly irrelevant to the achievement of the state's objective." *Id.* Furthermore, as we have repeatedly said, "It is not [the Court's] province to question the wisdom, social desirability or economic policy underlying a statute as these are matters for the legislature's determination." *Blaske*, 821 S.W.2d at 829, *quoting Winston*, 636 S.W.2d at 327. "The fact that we think the legislature's choices socially undesirable, unwise, or even unfair is of little consequence to our decision ... if the legislature's classification advances the legislature's legitimate policy." *Findley v.*

*City of Kansas City,* 782 S.W.2d 393, 396 (Mo. banc 1990).

Under Section 538.205 a "Health care provider" is:

> [A]ny physician, hospital, ambulatory surgical center, long-term care facility, dentist, registered or licensed practical nurse, optometrist, podiatrist, pharmacist, chiropractor, professional physical therapist, psychologist, physician-in-training, and any other person or entity that provides health care services under the authority of a license or certificate.

The statute purposely treats this restrictive class much differently than any other kind of tortfeasor who might be involved in a negligence lawsuit. Section 538.210 places a liability cap on noneconomic damages in any action against a health care provider that arises out of the rendering of health care services. Section 538.220 allows future damages to be paid in periodic or installment payments if the total award exceeds $100,000. Section 538.230 alters traditional joint and several liability and provides for apportioned fault to include a percentage allocated for parties who have been released from liability.

The exact purpose of this classification is somewhat uncertain. Amici supporting the legislation tell us that the provisions of Chapter 538 were enacted in 1986 in an effort to address a perceived malpractice insurance crisis in the health care industry which in turn threatened the availability and affordability of health care services. According to Amicus Briefs in support of the health care respondents, the legislature had before it information that the number of malpractice claims in Missouri increased 249 percent between 1981 and 1986; that aggregate and individual damage awards had accelerated to the extent that the state risked losing insurers; and that many physicians were believed to be considering leaving high risk areas of practice, potentially leaving many Missourians, particularly those in rural areas, without adequate medical protection. Thus, we are told that the primary goal of the General Assembly in passing Chapter 538 was to confront a medical malpractice insurance crisis that threatened adversely to affect primary health care in Missouri. Accordingly, the statute represents an effort by the legislature to reduce rising medical malpractice premiums and in turn prevent physicians and others from discontinuing "high risk" practices and procedures.

Both sides offer an array of evidence that both supports and refutes the existence of a "crisis" in medical malpractice premiums—enough evidence, in fact, that at the very least, it is a debatable proposition that such a crisis does in fact exist. Under equal protection rational review, this doubt must be resolved in favor of the General Assembly. While some clearly disagree with its conclusions, it is the province of the legislature to determine socially and economically desirable policy and to determine whether a medical malpractice crisis exists. Here, the preservation of public health and the maintenance of generally affordable health care costs are reasonably conceived legislative objectives that can be achieved, if only inefficiently, by the statutory provision under attack here.

The legislature could rationally believe that the cap on noneconomic damages would work to reduce in the aggregate the amount of damage awards for medical malpractice and, thereby, reduce malpractice insurance premiums paid by health care providers. Were this to result, the legislature could reason, physicians would be willing to continue "high risk" medical practices in Missouri and provide quality medical services at a less expensive level than would otherwise be the case.

The nonecomonic damage cap does not take away from any economic or punitive damage award. Moreover, the limit on noneconomic damages still allows $430,000 per liable defendant in this case, in addition to the nearly $5.9 million awarded in economic damages. As such, the limitation on noneconomic damages is a rational response to the legitimate legislative purpose of maintaining the integrity of health care for all Missourians.

Similarly, Section 538.220 is rationally related to the general goal of preserving adequate, affordable health care for all

Missourians. It permits defendants to satisfy a judgment for future damages in periodic or installment payments. By permitting installment payments, the legislature could reason that spreading future judgment payments over a period of time would reduce costs to insurance companies and reduce insurance premiums, lowering insurance premiums and making medical services less expensive and more available than would otherwise be the case.

Section 538.230.1 requires the finder of fact to apportion fault among all parties, including those who have been released from liability. Section 538.230.2 alters common law joint and several liability. "[A]ny defendant against whom an award of damages is made shall be jointly liable only with those defendants whose apportioned percentage of fault is equal to or less than such defendant." This alteration of joint and several liability limits the potential financial exposure of a health care defendant to the amount of that defendant's own responsibility for the plaintiff's injury. By so doing, the legislature could have reasoned that limiting the exposure of any individual defendant would reduce any individual insurance carrier's financial responsibility for a plaintiff's injuries caused by multiple tortfeasors (as is generally the case in medical malpractice actions), and serve to reduce or limit malpractice insurance premiums with the results previously discussed.

We hold that the provisions of Chapter 538 do not violate equal protection.

### D.

### Open Courts

■ Article I, section 14, provides:

[t]hat the courts of justice shall be open to every person, and certain remedy afforded for every injury to person, property or character, and that right and justice shall be administered without sale, denial or delay.

Appellants claim that Chapter 538 violates the "open courts" and "certain remedy" provisions of Missouri Constitution by permitting the legislature to intrude impermissibly upon the judicial process.

■ This Court has distinguished between statutes that impose procedural bars to access, and statutes that change the common law by the elimination (or limitation of) a cause of action. *Cf. State ex rel. Cardinal Glennon Memorial Hospital v. Gaertner*, 583 S.W.2d 107 (Mo. banc 1979), with *Blaske*, 821 S.W.2d 822 (Mo. banc 1991). The former are impermissible; the latter are a valid exercise of a legislative prerogative.

In *Blaske,* for example, this Court upheld a statute of repose that eliminated a cause of action for personal injury or wrongful death against designers and builders ten years following completion of construction. We held that the statute in *Blaske* did not violate article I, section 14, because that statute did not bar access to the courts to persons who had a valid cause of action; it simply modified the common law so that after ten years, the cause of action could not be pursued. Similarly, in *Harrell v. Total Health Care, Inc.,* 781 S.W.2d 58, 59–61 (Mo. banc 1989), this Court upheld a legislative elimination of all causes of action for medical malpractice against health service corporations as a valid exercise of legislative discretion to change the substantive common law.

In contrast, this Court in *Cardinal Glennon* determined that a pretrial procedure that required a malpractice plaintiff to submit his or her claim to the Professional Liability Review Board before filing a cause of action constituted an impermissible precondition on the plaintiff's right to access the courts.[5]

Here, Chapter 538 modifies the common law; it does not erect a condition precedent or any other procedural barrier to access to the courts. Nor does Chapter 538 deny plaintiffs a lawful remedy for a wrong done; it simply redefines the substantive

---

**5.** This Court in *Mahoney* distinguished *Cardinal Glennon* by noting that Section 538.225, unlike the statute under scrutiny in *Cardinal Glennon,* "does not operate until after the petition is filed and the incidents of jurisdiction to adjudicate are met." *Mahoney,* 807 S.W.2d at 509.

law by limiting the amount of noneconomic damages plaintiffs can recover. In sum, the constitutional right of access assures Missourians of the "right to pursue in the courts the causes of action the substantive law recognizes." *Mahoney*, 807 S.W.2d at 510; *Findley*, 782 S.W.2d at 396. It does not assure that a substantive cause of action once recognized in the common law will remain immune from legislative or judicial limitation or elimination.

The Adamses nonetheless suggest that the General Assembly must establish a reasonable substitute before abolishing or restricting a common law cause of action. They argue that without this *quid pro quo*, the statute arbitrarily denies full compensation to an injured plaintiff. They rely on *Lucas v. United States*, 757 S.W.2d 687 (Tex.1988), and *Smith v. Department of Insurance*, 507 So.2d 1080 (Fla.1987), as support for this proposition.

In *Lucas*, the Texas Supreme Court, on a certified question from the Fifth Circuit, found a Texas statute limiting total damages against a physician or health care provider to $500,000 and noneconomic damages to $150,000 unconstitutional. That court applied the open courts clause of the Texas Constitution to invalidate this total damage limitation by stating:

> We hold that the restriction is unreasonable and arbitrary and that [the statutory provisions] unconstitutionally limit Lucas's right to access to the courts.... the legislature has failed to provide Lucas any *adequate substitute* to obtain redress for his injuries.

[Emphasis added.] *Lucas*, 757 S.W.2d at 690.

The Supreme Court of Florida in similar fashion had earlier held that a $450,000 ceiling on noneconomic damages on all tort and contract cases violated the open courts provision of the Florida constitution. The Court first compared the Tort Reform Act with other constitutionally sound statutes that placed similar restrictions on plaintiffs' right to recover (e.g., no-fault insurance and sovereign immunity), and then held the statutory restrictions impermissible unless the legislature: (1) provided a reasonable alternative remedy or commensurate benefit or (2) showed an overpowering public necessity for the abolishment of the right and no alternative method of meeting such public necessity. *Smith*, 507 So.2d at 1088.

Missouri courts have never interpreted article I, section 14 of our constitution to mean more than its original, textually implicit purpose to assure Missourians of procedural due process. Thus, the "reasonable substitute" holdings of Texas and Florida are an interesting judicial gloss on the constitution. We reject the Texas and Florida interpretations. They arbitrarily and unnecessarily limit the legitimate lawmaking role of the legislative branch in a manner not intended by our constitution. Even arcane causes of action would be difficult for the legislature to eliminate under a *quid pro quo* requirement. Moreover, the Texas–Florida interpretation views the common law as an inviolate body of law, rather than as a starting point from which judicial declarations are subject to modification by legislative policy choices and subsequent judicial decisions necessary to meet the needs of a changing society. *Yerger v. Smith*, 89 S.W.2d 66, 74, 338 Mo. 140 (1935); *O'Dell v. School District of Independence*, 521 S.W.2d 403, 405 (Mo. banc 1975). Furthermore, by statute and decision, the common law is in force in Missouri only to the extent that it has not been subsequently changed by the legislature or judicial decision. Section 1.010; *Cook v. Cook*, 232 Mo.App. 994, 124 S.W.2d 675, 232 (1939).

The reasoning of the Texas and Florida decisions seem to apply equally to legislatively adopted causes of action. We doubt the wisdom of a rule of law that limits the legislature's ability to respond statutorily to changing societal concerns or correct previous policy positions upon receipt of better information.

The challenged portions of Chapter 538 do not violate article I, section 14.

### E.

### Trial by Jury

■ The Adamses' related argument is that the limitation on noneconomic dam-

ages denies plaintiffs their constitutional right to trial by jury. Article I, section 22(a) of the Missouri Constitution, provides in pertinent part:

That the right of trial by jury as heretofore enjoyed shall remain inviolate.... 

Appellants argue that this right includes the right to have the jury determine all damages without interference by the legislature.

The constitutional guarantee of the right to a jury trial has remained the same through four Missouri constitutions commencing with the Constitution of 1820. Thus, the right to jury trial protected by the present constitution is that which existed at common law before the adoption of the first constitution. *Goodrum v. Asplundh Tree Expert Company*, 824 S.W.2d 6, 11 (Mo. banc 1992), *quoting Miller v. Russell*, 593 S.W.2d 598, 605 (Mo.App. 1979).

A jury's primary function is fact-finding. This includes a determination of a plaintiff's damages. *Jaycox v. Brune*, 434 S.W.2d 539, 542–43 (Mo.1968). Here, the jury assessed liability and then determined damages, both economic and noneconomic. With that the jury completed its constitutional task.

■ The court applies the law to the facts. Section 538.210 establishes the substantive, legal limits of the plaintiffs' damage remedy. In this sense, the permissible remedy is a matter of law, not fact, and not within the purview of the jury. Because Section 538.210 is not applied until after the jury has completed its constitutional task, it does not infringe upon the right to a jury trial. *Etheridge v. Medical Center Hospitals*, 237 Va. 87, 376 S.E.2d 525 (1989). *See also Tull v. United States*, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987) (Interpreting the Clean Water Act). There is no substantive right under the common law to a jury determination of damages under the Seventh Amendment. The assessment of a civil penalty is not one of the "fundamental elements" preserved by the common law right to a jury trial); and *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 88–89, 98 S.Ct. 2620, 2638, 57 L.Ed.2d 595 (1978) (The common law never recognized a right to a full recovery in tort.)

■ In sum, the legislature has the right to abrogate a cause of action cognizable under common law completely. *DeMay v. Liberty Foundry Co.*, 327 Mo. 495, 37 S.W.2d 640, 649 (1931); *accord Harrell, Mahoney, Goodrum, supra*. If the legislature has the constitutional power to create and abolish causes of action, the legislature also has the power to limit recovery in those causes of action. The point is denied.

### F.

#### Due Process

■ Appellants claim that the challenged portions of Chapter 538 violate the Due Process clause of article I, section 10 of the Missouri Constitution, which reads in pertinent part:

That no person shall be deprived of life, liberty or property without due process of law.

The analysis required for this issue is the same as appellants' Open Courts claim under article I, section 14. (II, D, *supra*). Both clauses of the Missouri Constitution guarantee "no more than that a claimant is entitled to whatever process is constitutionally mandated or permitted under the laws extant at the time of claim." *Goodrum*, at 10, *quoting Findley*, 782 S.W.2d at 397–98. Here, the plaintiffs received all the process due them under law. We hold that the challenged portions of Chapter 538 do not violate due process.

### G.

■ The Adamses also raise an equal protection challenge to Section 538.300, RSMo 1989. That statute does not permit prejudgment interest on judgments against health care providers. The Adamses also claim that the challenged provisions of Chapter 538 violate: (1) the requirement of one subject (art. III, § 23); (2) the privileges and immunities clause (art. 1, § 13); (3) the constitutional directives for amending statutes (art. III, § 28); (4) the prohibi-

tion against special laws (art. III, § 40(28)); and (5) separation of powers (art. II, § 1).

The Adamses failed to preserve these constitutional challenges for appellate review. They were not raised at the earliest opportunity, but only after the trial court entered its judgment in post-trial motions.

In *Land Clearance for Redevelopment v. Kansas City*, 805 S.W.2d 173 (Mo. banc 1991), the appellant first raised the unconstitutionality of the statutory interest rate in a motion to amend the judgment. Appellants argued that the constitutional questions presented themselves only after judgment was entered on the verdict and could not have been known in advance. This Court held that the constitutional claim was waived when it was not raised at the earliest opportunity. We noted that the appellant could not have been surprised by the trial court's utilization of the statutory interest rate and that this issue could easily have been asserted before judgment. We reasoned that failure to raise the constitutional issue at an earlier stage denied party opponents an opportunity to offer an evidentiary response and denied the trial court a full opportunity to identify and rule on the issue. *Land Clearance*, 805 S.W.2d at 175–76. Moreover, "[a]n attack on the constitutionality of a statute is of such dignity and importance that the record touching such issues should be fully developed and not raised as an afterthought in a post-trial motion or on appeal." *Id.* at 176.

In similar fashion, the Adamses first raised the constitutional challenge to the prejudgment interest statute and the remaining constitutional issues in a post-trial motion to modify judgment.[6] As did the appellants in *Land Clearance*, the Adamses also assert that these matters were not "justiciable" until after trial. *Land Clearance* rejects the Adamses' argument as to prejudgment interest. It is denied here as well. As to the remaining constitutional issues, there is nothing peculiar to these constitutional provisions that would require a specific verdict before a challenge could

be made. For the reasons expressed in *Land Clearance*, the remaining constitutional points are also denied.

### III.

The Adamses' constitutional challenges are denied. The cause is transferred to the court of appeals.

COVINGTON, HOLSTEIN, BENTON and THOMAS, JJ., and BLACKMAR, Senior Justice, concur.

RENDLEN, Senior Justice, dissents.

PRICE, J., not sitting because not a member of the Court when case was submitted.

---

6. The "separation of powers" argument, however, apparently was first raised in appellants' brief to this Court.