

# SUPREME COURT OF MISSOURI
## en banc

NO BANS ON CHOICE, AMERICAN )    *Opinion issued February 8, 2022*
CIVIL LIBERTIES UNION OF )
MISSOURI, and SARA E. BAKER, )
                                         )
         Respondents, )
                                           )
v. )     No. SC98879
                                           )
JOHN R. ASHCROFT, in his official )
capacity as Missouri Secretary of State )
                                           )
         Appellant. )

## APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY
### The Honorable Jon E. Beetem, Judge

Amidst a ballot referendum campaign, Sara Baker, the ACLU of Missouri, and No Bans on Choice (collectively, "Challengers") filed suit against the Missouri Secretary of State. The lawsuit challenged the constitutional validity of sections 116.180 and 116.334.2,[1] which prohibit the collection of referendum petition signatures before the Secretary has certified the referendum's "official ballot title" and affixed it to the petition. The circuit court issued a declaratory judgment invalidating sections 116.180 and 116.334.2 because those provisions "interfere with and impede" the right of referendum

---

[1] All statutory references are to RSMo 2016, unless otherwise specified.

and, therefore, conflict with article III, sections 49 and 52(a) of the Missouri Constitution. The judgment is affirmed.

## Background

### I. Referendum Process

The voters of Missouri first adopted a constitutional amendment establishing the right of referendum more than 100 years ago in 1908. *Marsh v. Bartlett*, 121 S.W.2d 737, 742 (Mo. 1938).[2] The right of referendum is now contained in article III, sections 49 and 52(a) of the Missouri Constitution. Article III, section 49 states: "The people reserve power to propose and enact or reject laws and amendments to the constitution by the initiative, independent of the general assembly, and also reserve power to approve or reject by referendum any act of the general assembly, except as hereinafter provided." Article III, section 52(a) further provides:

> A referendum may be ordered ... by petitions signed by five percent of the legal voters in each of two-thirds of the congressional districts in the state .... *Referendum petitions shall be filed with the secretary of state not more than ninety days after the final adjournment of the session of the general assembly which passed the bill on which the referendum is demanded.*

(Emphasis added).[3] The General Assembly is permitted to enact "reasonable implementations" of the referendum process. *State ex rel. Upchurch v. Blunt*, 810

---

[2] Missouri is one of 24 states that allows citizens to petition for elections on legislative enactments through a "popular referendum" without any involvement by the legislature. *Initiative, Referendum, and Recall*, Nat'l Conf. of State Legislatures, http://www.ncsl.org/legislatures-elections/elections/initiative-referendum-and-recall-overview.aspx (last visited Feb. 7, 2022).

[3] Article III, section 20(a) of the Missouri Constitution designates May 30 as the date of the final adjournment of the General Assembly. Article III, section 52(a)'s deadline for filing referendum petitions within 90 days of the final adjournment of the legislative session coincides with article III, section 29 of the Missouri Constitution, which states that, with certain listed exceptions, laws

S.W.2d 515, 516 (Mo. banc 1991). A framework for exercising the right of referendum was enacted by the legislature in chapter 116.

To initiate the process, the referendum proponent must first submit the proposed petition "in the form in which it will be circulated" to the Secretary, who must then send it to the Attorney General to conduct an independent review of its form and provide comments within 10 days. Sections 116.332.1, .3. The Secretary has the ultimate authority to approve or reject the form of the petition and must do so within 15 days after the petition was first submitted and following the Attorney General's review. Sections 116.332.3, .4. If the petition is approved, the Secretary is given 23 days to prepare a "summary statement" of the measure, and the State Auditor must prepare a "fiscal note" and "fiscal note summary." Sections 116.334.1, 116.175.2. The Attorney General must then issue an opinion about the form and content of the summary statement and fiscal note summary. Sections 116.175.4, 116.334.1. Within three days of receiving the Attorney General's approval for both summaries, the Secretary must combine those summaries to create the "official ballot title," which must be placed on the ballot measure if it is put before the voters. Sections 116.010(4), 116.180. In sum, it may take up to 51 days from the time the proponent first submits the proposed petition until the official ballot title is certified.

_____

passed by the General Assembly shall take effect 90 days after the final adjournment of the General Assembly. Together, these three provisions designate August 28 as both the deadline for filing referendum petitions and the date on which laws passed during the previous session of the General Assembly take effect.

Until 1997, proponents were able to circulate the referendum petition for signatures before the ballot title was certified. But, in that year, the legislature amended chapter 116 and enacted sections 116.180 and 116.334.2 to prohibit the circulation of referendum petitions before the official ballot title is certified and affixed to the petition. As a result of this legislation, a referendum proponent may be delayed up to 51 days before collecting signatures to have the measure placed on the ballot.

## II. 2020 Referendum Effort

The General Assembly passed House Bill No. 126 on May 17, 2019, the last day to pass legislation during the 2019 session, and signed by Governor Parson on May 24.[4] Four days later, Baker, on behalf of the ACLU, submitted a proposed referendum petition on HB 126 to Secretary of State Ashcroft, seeking to place it on the ballot for the 2020 general election. On June 6, 2019, the Secretary notified Baker and the ACLU he was rejecting the proposed referendum petition because HB 126 contained an emergency clause, requiring some of its provisions to become effective immediately. The Secretary concluded the emergency clause exempted the entire bill from the referendum process because legislation may not be challenged via referendum after it becomes effective. *See State ex rel. Moore v. Toberman*, 250 S.W.2d 701, 706 (Mo. banc 1952).

Baker and the ACLU sued the Secretary, alleging such constitutional grounds were not a sufficient basis for rejecting the proposed petition. The circuit court ruled in favor of the Secretary, but on July 8, 2019, the court of appeals reversed and ordered the

---

[4] HB 126 repealed sections 188.027 and 188.052 and enacted sections 188.026, 188.027, and 188.052 in lieu thereof.

4

Secretary to immediately approve the sample sheet of the referendum petition as sufficient as to form pursuant to section 116.332.4 and proceed with the official ballot title certification process. *ACLU v. Ashcroft*, 577 S.W.3d 881, 899-900 (Mo. App. 2019). At that time, the Secretary and Attorney General had 36 days to complete the certification process pursuant to sections 116.334.1, 116.175.2, 116.175.4, and 116.180. The ACLU asked the court of appeals to shorten the statutory timeframe for certification to offset the delay caused by the emergency litigation, but the court ruled it had "no authority to modify the provisions of that statute, including the times therein permitted for performance." *Ashcroft*, 577 S.W.3d at 900 n.21.[5]

State officials ultimately used all 36 days to complete the official ballot title certification. The Secretary did not certify the official ballot title and approve the petition for signature circulation until August 14, 2019. As a result, Baker and the ACLU were left with 14 days to circulate the petition and submit 107,510 signatures to the Secretary in accordance with article III, section 52(a).[6] On August 22, Challengers filed suit in the circuit court against the Secretary, arguing sections 116.180 and 116.334.2 violated the Missouri Constitution in that they conflicted with the right of referendum under article III, sections 49 and 52(a). Baker and the ACLU ultimately failed to collect the requisite signatures within the 14-day timeframe, and the referendum was not placed on the ballot.

---

[5] The ACLU filed an emergency motion for rehearing or transfer, arguing those statutory timeframes were unconstitutional as applied in the case. The court of appeals overruled the motion. The ACLU then applied to this Court for transfer, which this Court denied.
[6] Article III, section 52(a) requires referendum petitions to be signed by 5 percent of registered voters in two-thirds of Missouri's congressional districts to be placed on the ballot.

The circuit court subsequently issued a declaratory judgment that sections 116.180 and 116.334.2 were unconstitutional because they conflicted with article III, sections 49 and 52(a) in that they "interfere with and impede" the right of referendum.[7]

## Standard of Review

If a statute conflicts with a constitutional provision, this Court must declare that statute invalid. *Upchurch*, 810 S.W.2d at 516. The validity of a statute is a question of law reviewed *de novo*. *Trenton Farms RE, LLC v. Hickory Neighbors United, Inc.*, 603 S.W.3d 286, 290 (Mo. banc 2020). A statute is presumed valid and will not be declared unconstitutional unless it clearly contravenes a constitutional provision. *Id.*

## Analysis

The issue before this court is whether sections 116.180 and 116.334.2 violate the right to referendum as found in article III, sections 49 and 52(a) of the Missouri Constitution. In establishing the right of referendum, the people of Missouri constitutionally reserved a share of the legislative power for themselves. *State ex rel. Barrett v. Dallmeyer*, 245 S.W. 1066, 1068 (Mo. banc 1922).[8] The purpose of this right

---

[7] This Court has jurisdiction pursuant to article V, section 3 of the Missouri Constitution.

[8] Immediately following its creation, the referendum was widely used. David C. Valentine, *Constitutional Amendments, Statutory Revision and Referenda Submitted to the Voters by the General Assembly or by Initiative Petition, 1910-2008*, Report 25-2008, at 3, https://mospace.umsystem.edu/xmlui/bitstream/handle/10355/2524/ConstitutionalAmend mentsStatutoryRevision.pdf?sequence=1&isAllowed=y. While it has been used more sparingly in the decades since, when the right to referendum is employed, voters are more often than not inclined to exercise the power reserved for them; 24 of the 26 referenda put before the voters between 1914 and 2008 have resulted in the rejection of bills enacted by the General Assembly. *Id.* at 2. Voters also struck down the General Assembly's "right to work" bill in the only referendum put on the ballot since 2008. Scott Neuman, *Missouri Blocks Right-to-Work Law*, NPR, Aug. 8, 2018, https://www.npr.org/2018/08/08/636568530/missouri-blocks-right-to-work-law (last visited Feb. 7, 2022).

6

is to "provide the people a means of giving expression to a legislative proposition[.]" *Toberman*, 250 S.W.2d at 706. The referendum process ensures that "those who have no access to or influence with elected representatives may take their cause directly to the people." *Missourians to Protect the Initiative Process v. Blunt*, 799 S.W.2d 824, 827 (Mo. banc 1990). The referendum also exists to serve as a check on the legislature. *State ex rel. Drain v. Becker*, 240 S.W. 229, 230-31 (Mo. banc 1922).

Legislation to implement the referendum process is presumed to be constitutionally valid. *Rekart v. Kirkpatrick*, 639 S.W.2d 606, 608 (Mo. banc 1982). But laws enacted to implement the referendum process must be invalidated when they "interfere with or impede a right conferred by the constitution[.]" *Id.* In other words, "[m]inor details may be left for the legislature without impairing the self-executing nature of constitutional provisions ... but all such legislation must be subordinate to the constitutional provision and in furtherance of its purposes, and must not ... attempt to narrow or embarrass it." *Musser v. Conrod*, 496 S.W.2d 8, 11 (Mo. banc 1973).

The circuit court concluded sections 116.180 and 116.334.2 unconstitutionally "interfere with and impede" the right of referendum. [9] It determined that, by prohibiting

---

[9] The Secretary asserts several arguments for why the circuit court should not have reviewed Challengers' claim on the merits. First, the Secretary argues Challengers' claim was barred by *res judicata* and waiver due to Baker and the ACLU's previous litigation against the Secretary. *Res judicata* requires the new claim to arise out of the same act, contract or transaction as the previous claim. *Kesterson v. State Farm Fire & Cas. Co.*, 242 S.W.3d 712, 716 (Mo. banc 2008). But the prior litigation arose out of the Secretary's rejection of the proposed referendum petition, which was an entirely separate issue from the validity of sections 116.180 and 116.334.2. While the parties did challenge the ballot title provisions to the extent they could in the course of the prior lawsuit, the constitutional validity of those provisions was not reviewed on the merits. *See ACLU v. Ashcroft*, 577 S.W.3d at 900 n.21. Similarly, Challengers' claim was not waived because the time constraints on circulation imposed by sections 116.180 and

7

proponents from circulating a petition before the official ballot title is certified and affixed to the petition, the challenged statues "dramatically reduce the time available for the circulation of a referendum petition, both in theory and in practice." In reaching its decision, the circuit court cited three of this Court's prior decisions to support the proposition that the State "may not constitutionally delay the circulation of a referendum petition for the purpose of certifying a ballot title."

In the first case cited by the circuit court, *Boeving v. Kander*, 496 S.W.3d 498, 507 (Mo. banc 2016), this Court explained that the Missouri Constitution "***only*** authorizes legislation detailing the requirement for an 'official ballot title' at the time [a] proposed constitutional amendment is put before the voters" and that there is "no similar express constitutional authorization" for legislation requiring an official ballot title ***before*** the petition may be circulated for signatures. This Court explicitly noted, however, that the question of whether such a pre-circulation ballot title requirement would be constitutionally permissible was not presented in the case. *Id.* at 508.

---

116.334.2 did not affect Baker and the ACLU until *after* the court of appeals ordered the Secretary to commence the ballot title certification process. As such, the parties did not fail to present their constitutional question "at the earliest possible moment that good pleading and orderly procedure will admit ...." *Meadowbrook Country Club v. Davis*, 384 S.W.2d 611, 612 (Mo. banc 1964) (internal quotation omitted).

     The Secretary also argues Challengers' claim was not justiciable. Challengers, however, clearly had standing to challenge sections 116.180 and 116.334.2 in the midst of their referendum campaign. While the claim may have been rendered moot once the deadline to submit signatures to the Secretary came to pass, the time-sensitive nature of the referendum process would place the claim squarely within the mootness exception of "capable of repetition, yet evading review." *See State ex rel. Reser v. Rush*, 562 S.W.2d 365, 367 (Mo. banc 1978) ("The problem presented is one which is 'capable of repetition, yet evading review,' and needs to be resolved and put to rest. Accordingly, notwithstanding the suggestion of mootness, we will decide the case on the merits, being of opinion that the questions involved are matters of public rights or interests under conditions which may be repeated any time." (internal citation omitted)).

In the second case, *Union Electric Co. v. Kirkpatrick*, 678 S.W.2d 402, 405 (Mo. banc 1984), this Court held that, although the proponent's title on a proposed ballot initiative did not express clearly the subject matter of the proposal, petition signers could not have been deceived or misled at this stage of the initiative process because the full act appeared on the back of each petition. In the third case, *United Labor Committee of Missouri v. Kirkpatrick*, 572 S.W.2d 449, 454 (Mo. banc 1978), this Court noted that previous decisions "discussed the importance of the initiative and referendum, emphasizing that procedures designed to effectuate these democratic concepts should be liberally construed to avail the voters with every opportunity to exercise these rights." *United Labor* held: "The ability of the voters to get before their fellow voters issues they deem significant should not be thwarted in preference for technical formalities." *Id.* Together, these cases suggest that an official ballot title is not necessary to prevent individuals from being deceived at the petition-signing stage and that the ability to exercise the constitutional right of referendum should not be "interfered with or impeded" by a pre-circulation ballot title requirement.

The Secretary contends sections 116.180 and 116.334.2 leave sufficient time to gather signatures in "virtually all circumstances." But Challengers argue the process of procuring the official ballot title prior to circulation is quite time-consuming. As the circuit court explained, the full signature-collection period for a referendum on a measure passed on the last day of the legislative session is only 90 days, and sections 116.180 and 116.334.2 "permit the government to take away 51 of those days." The Secretary points to testimony presented by Challengers indicating an organization could feasibly collect

9

the requisite number of signatures within 39 days under the worst-case scenario. But not every citizen who may wish to utilize the right of referendum has access to the same resources as Challengers. For example, Baker testified that, in the time leading up to the signature-collection stage, she solicited contributions from donors who had sufficient available funds to pay a firm that specializes in signature-gathering. And the circuit court found "every day the time for signature collection on a referendum petition is reduced, the cost of gathering enough signatures to get the referendum before voters will go up." The Missouri Constitution guarantees the right of referendum to *all* Missouri citizens, not just those capable of raising the necessary funds to complete a signature-collection effort within the tightest of timeframes.

In practice, the pre-circulation ballot title requirement has indeed proved to be a hinderance to the referendum process. The circuit court determined the average amount of time the State took to certify official ballot titles between 2016 and 2020 ranged from 35 to 47 days. For bills passed on the last day of session, this delay constitutes from more than one-third to more than one-half of the 90 days allotted for petition circulation. Further, since the challenged statutes were enacted in 1997, only one referendum campaign, the 2018 challenge to the "right-to-work" bill, collected enough timely signatures to have the measure placed on the ballot. That campaign also benefitted from the challenged legislation being signed by the governor on February 6, 2017, which was 113 days before the final adjournment of the legislative session and, therefore, 203 days before the deadline to file a referendum petition under article III, section 52(a).

10

The legislature inherently has the power to reduce the time to circulate a referendum petition on any particular piece of legislation by delaying the passage of that legislation until the end of the legislative session. But by significantly reducing the allotted circulation period even further, sections 116.180 and 116.334.2 afford the legislature the opportunity to "interfere with or impede" the right of referendum by, in effect, controlling the viability of any referendum. The dissent notes that the legislature *may* pass legislation before the end of the legislative session and accordingly leave referendum proponents more than 90 days to circulate a petition for signatures, even when state officials use the full 51 days to complete the official ballot title certification process. But regardless of if or when the legislature chooses to pass legislation during its session, sections 116.180 and 116.334.2 "interfere with and impede" the right of referendum because they give the legislature the *power* to make any referendum effort untenable.

The Secretary argues that, to declare sections 116.180 and 116.334.2 invalid, this Court must determine that a referendum proponent could *never* successfully collect enough timely signatures to have a measure placed on the ballot. *See State v. Jeffrey*, 400 S.W.3d 303, 308 (Mo. banc 2013) ("Generally, to prevail in a facial challenge, the party challenging the statute must demonstrate that no set of circumstances exists under which the statute may be constitutionally applied.").[10] But the standard for determining if a law

---

[10] While the Secretary argued before the circuit court that sections 116.180 and 116.334.2 do not conflict with the Missouri Constitution, the Secretary never asserted that the Challengers must show there are no set of circumstances under which sections 116.180 and 116.334 could be constitutionally applied to prevail on their claim. As such, the Secretary arguably failed to

violates article III, sections 49 and 52(a) is whether the law "interferes with or impedes" the *right* of referendum, not whether it "interferes with or impedes" any particular referendum effort. *See Rekart*, 639 S.W.2d at 608. A law need not prevent every individual referendum effort from being successful to "interfere with or impede" the right of referendum itself. Consequently, because sections 116.180 and 116.334.2 "interfere with and impede" the right of referendum, they can *never* be constitutionally applied.

As this Court has emphasized, the establishment of the constitutional right of referendum was a fundamental expression of the power held by the people:

> Under our system, that intangible thing we call "government," the existence of which is least felt when best administered, has its origin in and draws its life and inspiration from the people. They frame and adopt the organic law, which defines the limits of legislative action; they incorporate therein whatever provisions they may deem proper. Thus empowered, as are the people in all governments organized as is ours, the inevitable conclusion follows that if they determine, as they have in the adoption of the initiative and referendum, to limit the province or modify the purview of the Legislature in the adoption or rejection of laws, there is no power that can say them nay.
>
> . . . .
>
> To any one familiar with the power for good or ill which the Legislature may wield, it cannot but be regarded as an act of prudence that the people, the repository of all power, and vitally interested in all that pertains to the conduct of public affairs, should reserve unto themselves the right to correct any evils which may result from unwise legislation.

---

preserve this argument for appellate review. *See State v. Davis*, 348 S.W.3d 768, 770 (Mo. banc 2011) ("Because an appellate court is not a forum in which new points will be considered ... only those objections or grounds of objection which were urged in the trial court, without change and without addition, will be considered on appeal." (internal quotation omitted)). Nevertheless, this Court will assume, *arguendo,* that the argument was properly preserved and address it on the merits.

*Becker*, 240 S.W. at 230-31. The legislature must not be permitted to use procedural formalities to interfere with or impede this constitutional right that is so integral to Missouri's democratic system of government.

## Conclusion

Sections 116.180 and 116.334.2's prohibition on collecting referendum petition signatures prior to the Secretary's certification of the official ballot title "interferes with and impedes" the constitutional right of referendum reserved to the people by unreasonably shortening the timeframe for petition circulation. As such, the circuit court's judgment declaring those statutes constitutionally invalid is affirmed.

_____
Mary R. Russell, Judge

Wilson, C.J., Breckenridge, Draper, Ransom, JJ., concur;
Powell, J., dissents in separate opinion filed;
Fischer, J., concurs in opinion of Powell, J.



# SUPREME COURT OF MISSOURI
## en banc

NO BANS ON CHOICE, AMERICAN )
CIVIL LIBERTIES UNION OF )
MISSOURI, and SARA E. BAKER, )
                     )
         Respondents, )
                     )
v. )        No. SC98879
                     )
JOHN R. ASHCROFT, in his official )
capacity as Missouri Secretary of State, )
                     )
         Appellant. )

## DISSENTING OPINION

I respectfully dissent because Sara Baker, the ACLU of Missouri, and No Bans on Choice (collectively, "Challengers") have not demonstrated sections 116.180 and 116.334.2 are facially invalid.[1]  While Challengers' referendum rights may have been interfered with or otherwise impeded in the past, Challengers do not seek relief from the application of sections 116.180 and 116.334.2 during their previous ballot referendum campaign.  As the principal opinion notes, Challengers specifically requested in their petition, and the circuit court ultimately granted, declaratory relief outright invalidating

---

[1] All statutory references are to RSMo 2016.

both statutes in all situations.  Challengers, therefore, do not challenge the application of the statutes *as they were applied to them* in the past.  Rather, Challengers mount a facial challenge seeking to invalidate the applications of the statutes *for everyone* going forward.  Because circumstances exist in which sections 116.180 and 116.334.2 may be applied without interfering with or impeding the constitutional right of referendum guaranteed in article III, sections 49 and 52(a) of the Missouri Constitution, Challengers' facial challenge seeking to invalidate these statutes must be rejected.

**Analysis**

"This Court reviews the constitutional validity of statutes *de novo*."  *Fowler v. Mo. Sheriffs' Ret. Sys.*, 623 S.W.3d 578, 584 (Mo. banc 2021) (internal quotation omitted).  The Court presumes a statute is constitutional, finding it unconstitutional only if "it clearly and undoubtedly contravenes the constitution."  *Adams By and Through Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898, 903 (Mo. banc 1992), *overruled on other grounds by Watts v. Lester E. Cox Med. Ctrs.*, 376 S.W.3d 633, 636 (Mo. banc 2012).  "In order to mount a facial challenge to a statute, the challenger must establish that no set of circumstances exists under which the [statute] would be valid."  *Donaldson v. Mo. State Bd. of Registration for the Healing Arts*, 615 S.W.3d 57, 66 (Mo. banc 2020) (alteration in original).  Courts should rarely tolerate facial challenges to the constitutional validity of a statute:

> Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation.  As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records.  Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to

2

which it is to be applied. Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that [a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008) (alteration in original) (internal quotation and citation omitted).

Article III, section 52(a) provides, "Referendum petitions shall be filed with the secretary of state not more than ninety days after the final adjournment of the session of the general assembly which passed the bill on which the referendum is demanded." The Missouri Constitution therefore, guarantees referendum proponents only 90 days to collect the necessary signatures to place the referendum on the ballot because referendum-contested legislation may be passed on the last day of the legislative session. While the legislature may neither "impede" nor "interfere" with the right of referendum, *Rekart v. Kirkpatrick*, 639 S.W.2d 606, 608 (Mo. banc 1982), the legislature has the power to enact reasonable, practical regulations to address the realities of implementing a constitutional right. *State ex rel. Upchurch v. Blunt*, 810 S.W.2d 515, 516 (Mo. banc 1991) (noting the legislature may "enact reasonable implementations of a constitutional directive"). As long as legislatively enacted regulations to the referendum process do not limit the 90 days set aside to collect signatures and submit petitions to the Secretary of State, the regulations would not interfere with or impede the time period guaranteed by the right of referendum and would be presumably reasonable and practical. *Adams*, 832 S.W.2d at 903 (The Court presumes a statute is constitutional, finding it unconstitutional only if "it clearly and undoubtedly contravenes the constitution.").

3

Of course, the legislature may pass legislation before the end of the legislative session. Referendum proponents accordingly would enjoy in excess of the 90 days to collect signatures and comply with the relevant statutory regulations, even if state actors took the full 51 days Missouri statutes permit for reviewing and certifying the ballot title.[2] In such a circumstance, the referendum regulations would neither impede nor interfere with the 90 days set aside by the Missouri Constitution to collect signatures and submit the referendum petitions to the Secretary of State. Because the legislature may enact reasonable, practical regulations to the referendum process and circumstances exist in which sections 116.180 and 116.334.2 would not impede or interfere with the right of referendum, Challengers' facial challenge lacks merit, and the circuit court erred in invalidating these statutes.

The principal opinion insinuates the Secretary of State ("State") failed to preserve its facial challenge argument by neglecting to raise the argument before the circuit court. The mere suggestion that the State's facial challenge argument is unpreserved and unreviewable is untenable for many reasons. First, the State did answer Challengers' claims, vehemently asserting the statutes were constitutional.[3] Admittedly, the State cited no caselaw pertinent to facial constitutional challenges, but this omission is inconsequential. Even if the State had utterly failed to contend sections 116.180 and 116.334.2 were constitutional, which it did not, this Court could not eschew its duty to

---

[2] *See* §§ 116.332.1, .3, .4; § 116.334.1; §§ 116.175.2, .4; § 116.010(4); § 116.180.
[3] The State did so in its motion to dismiss, the affirmative defenses listed its answer to Challengers' amended petition, and its pretrial brief.

4

conduct *de novo* review applying controlling precedent to the circuit court's judgment declaring sections 116.180 and 116.334.2 unconstitutional and invalidating acts of the legislature.[4]  As the principal opinion concedes, "[t]his Court reviews the constitutional validity of statutes *de novo*." *Fowler*, 623 S.W.3d at 584 (internal quotation omitted).  It also presumes statutes are constitutional. *Adams*, 832 S.W.2d at 903.  Challengers, not the State, have the burden of rebutting this presumption and demonstrating the reasons their claim merits the relief requested. *Id.*  In conducting *de novo* review of a properly presented challenge to the constitutional validity of a statute, this Court has no authority to relieve Challengers of that burden of persuasion by requiring the State, or any other party, to make arguments supporting the validity of the statute.

These principles reflect this Court's constitutional function: "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803) (holding American courts may invalidate laws and statutes in conflict with the United States Constitution); *see also* Mo. Const. art. V, sec. 1 ("The judicial power of the state shall be vested in a supreme court[.]"); Mo. Const. art. V, sec. 3 ("The supreme court shall have exclusive appellate jurisdiction in all cases involving the validity of … a statute or provision of the constitution of this state[.]").  This Court cannot, and should not, relinquish its constitutional duty to review the validity of a statute merely

---

[4] A court could not raise constitutional challenges *sua sponte* on *behalf of the party seeking to strike down the statute*.  Such an act would put this Court in a position of advocacy, hinder its constitutional purpose of impartial review, and, therefore, would violate separation of powers. *See e.g., White v. U. S. Pipe & Foundry Co.*, 646 F.2d 203, 204 (5th Cir. 1981).  The Court, however, does not act as an advocate when it independently retrieves caselaw *supporting* constitutional validity in a *de novo* review.

because the State failed to identify the proper standard of review of a facial challenge in its argument to the circuit court. If this were possible, the State could collude with other litigants to orchestrate outcomes by declining to faithfully defend statutes and narrowing the scope of the caselaw reviewable by this Court.[5] The State, acting through the Attorney General, would become the ultimate arbiter of a statute's constitutional validity.[6] The Missouri Constitution charges this Court, not the Attorney General or any other member of the executive branch, with exercising its judicial power to review a proper challenge to the constitutional validity of a statute. Mo. Cont. art. V, § 1. This review necessarily includes considering this Court's precedents regardless of whether the State, or any other party supporting the constitutional validity of a statute, has properly presented and briefed the circuit court on the law related to facial challenges.

---

[5] Say, for example, a group of litigants filed an action mounting a facial challenge to a statute on the grounds that it violated the right to have an abortion guaranteed by *Roe v. Wade*, 410 U.S. 113 (1973). If the State, acting through the Attorney General, agreed with the litigants' viewpoint and purposefully limited its defense of the statute by raising only irrelevant arguments and abstained from mentioning law pertinent to facial challenges, would this Court be precluded from conducting its own review of the merits of the litigants' constitutional claims?

[6] Such action would likely also violate article II, section I of the Missouri Constitution, which prohibits each branch of government from exercising powers granted to a different branch.

**Conclusion**

For these reasons, I disagree with the principal opinion's analysis and conclusion that sections 116.180 and 116.334.2 facially violate the right of referendum contained in article III, sections 49 and 52(a) of the Missouri Constitution. I would reject Challengers' arguments and reverse the circuit court's judgment.


_____
W. Brent Powell, Judge